UNITED STATES of America

v.

**Allen O'Donald NASH.**

**Crim. Nos. 76–H–61, 76–H–83.**

United States District Court,
S. D. Texas,
Houston Division.

June 23, 1976.

Donald L. Lambright, Asst. U. S. Atty., Houston, Tex., for the United States.

Mike DeGeurin, Asst. Federal Public Defender, Houston, Tex., for defendant.

## MEMORANDUM AND ORDER

NOEL, District Judge.

These actions are before the Court on the motion of defendant Nash to suppress incriminating statements made by him during an interview on February 23, 1976 with Dennis A. Schreck, a special agent of the Federal Bureau of Investigation (FBI). Defendant has alleged that these oral state-

ments were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). An evidentiary hearing was held on defendant's motion and after consideration of the stipulations of the parties, the evidence adduced, and the arguments of counsel, the Court concludes that the motion should be denied.

The pertinent facts follow. On February 20, 1976 officers of the Texas Commerce Bank advised Agent Schreck that the bank had just discovered a loss of $1,044.00 in coins from the armored car teller vaults. It was determined that the loss must have taken place after 5:00 p. m. on February 19, 1976, but before the bank opened on the morning of February 20, 1976. Agent Schreck was further advised that the last authorized personnel in the armored car vault area on the evening of February 19, 1976 was a cleaning crew composed of two women and Nash. Schreck questioned one of the cleaning women about her movements on the evening of February 19 and her knowledge, if any, of how the coins might have disappeared. The cleaning woman denied having any knowledge of the apparent theft of the coins, but stated that Nash was the last member of the cleaning crew in the armored car vault area on February 19. The building maintenance supervisor informed Schreck that Nash was a new employee who began work on February 19. Schreck also learned that Nash had come to work on Friday, February 20, with a relatively large amount of money in his possession.

With these facts in mind, Agent Schreck decided to interview Nash. The interview was conducted during the defendant's regular working hours on Monday, February 23, commencing at 3:54 p. m. in the security office of the bank. Immediately prior to the interview, Nash was on duty and performing his work in the bank. Nash's supervisor took him to the security office and left him there alone with Agent Schreck.

Schreck did not identify himself as an FBI agent, nor did he give Nash the *Miranda* warnings prior to the commencement of the questioning. Schreck began the interview by telling Nash that he wanted to talk with him about the bank's loss of a large amount of coins. Schreck then started to question Nash along the same lines as Schreck had earlier questioned the cleaning woman, inquiring as to Nash's movements on the night of February 19, 1976 and asking whether he knew anything about the disappearance of the coins. Nash initially denied having any knowledge of how coins disappeared. Agent Schreck asked Nash why he had come to work on Friday, February 20, with a large amount of money on him. Nash replied that he had come to work with $100 to pay off his mother's phone bill.

During the middle of the interview Schreck received a telephone call from a security officer of the bank by the name of Carmichael who informed Schreck that he had just learned Nash had cashed in a large amount of coins for paper currency at a Texas Commerce Bank teller window at approximately 5:30 p. m. on February 19. Schreck thereupon asked Nash about this exchange of coins for paper currency. Nash responded initially by denying that he knew anything about the missing coins, but after a short pause he admitted that he had stolen the coins by prying open the doors to the teller vaults. Schreck, not having previously identified himself as an FBI agent, immediately did so by showing Nash his badge. Schreck did not allow Nash to make any further statements of any kind until he had apprised Nash of his *Miranda* rights by reading to him a waiver of rights form [1] and then handing the form to Nash for defendant to read himself. It was 4:39 p. m. when the waiver form was handed to Nash and 4:43 p. m. when the form was signed by him. Thus, approximately 45 minutes had elapsed from the beginning of

---

1. See Government's Exhibit # 1. Defendant testified, contrary to Agent Schreck, that the waiver form was not read to him, but was simply handed to him for Nash to read himself.

The Court finds that defendant's testimony is lacking in credibility in this respect and entitled to no weight.

the interview until the time Nash first implicated himself in the theft of the coins.

After signing the waiver form, Nash made a detailed confession to the theft. He explained that he had pried open two teller vault doors with a screwdriver and had removed $30 in coins from one door and $310 in coins from the other door. At 5:03 p. m., one hour and nine minutes after the interview had begun, Nash and Agent Schreck left the security office and went to the armored car vault area where defendant showed Schreck the two doors he had opened, as well as the screwdriver that he had used in prying open the doors. After the interview, Nash was informed that he was free to go home. He was not formally arrested or his liberty overtly restrained in any way on the day of the interview. He was merely instructed to telephone Agent Schreck on the following day. Nash did so and was told to come to the FBI offices. Nash voluntarily came in, whereupon he was arrested by the FBI. He was later placed in the custody of the United States Marshal at which time a number of coins from the bank theft were found on his person.

■ These facts present a nice question as to the applicability of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In *Miranda,* the Supreme Court found that custodial interrogation is inherently coercive. Accordingly, it was held that statements made during an in-custody interrogation are *per se* involuntary and inadmissible unless the defendant has been adequately apprised of his Fifth and Sixth Amendment rights at the outset of the interrogation, and thereafter knowingly and intelligently waived said rights. Thus, *Miranda* is applicable if and only if three determinations are made. First, it must be determined that the statement in question was not made spontaneously, but was obtained in response to questioning by a law enforcement officer, secondly, that the statement was made while the defendant was in custody or otherwise deprived of his freedom of action in a significant way, and

finally, that there was no valid waiver of *Miranda* rights.

Here, it is undisputed that Nash's incriminating statements were made in response to questioning by an FBI agent and that there was no waiver of any kind by Nash prior to his first incriminating statement. The disputed question with respect to the first incriminating statement is whether Nash was in custody at the time that statement was made. If so, that admission is clearly inadmissible under *Miranda* and the second, detailed confession would be tainted thereby and also inadmissible, despite the intervening *Miranda* warnings and waiver. See *Randall v. Estelle,* 492 F.2d 118 (5th Cir. 1974). If, on the other hand, Nash was not in custody when he first incriminated himself, thus making *Miranda* inapplicable to the first statement, the Court must then determine whether defendant was in custody at the time he made the second confession or whether in any event he knowingly waived his *Miranda* rights prior to the second confession.

■ The Court's first task is to apply the elusive *Miranda* concept of custody and determine whether defendant at the time he made his first incriminating statement was deprived of his freedom to such an extent as to make that statement subject to the prophylactic exclusionary rule of *Miranda.* The Court of Appeals for the Fifth Circuit has consistently refused to formulate a general rule by means of which the courts can mechanically distinguish "custodial" from "non-custodial" interrogation. See *U. S. v. Phelps,* 443 F.2d 246 (5th Cir. 1971). Nevertheless, there are certain well-established applicable principles. For example, it is now clear that the mere fact interrogation takes place in the familiar surroundings of the defendant's home or place of business rather than in a police station does not necessarily mean the defendant is not being subjected to custodial interrogation. *Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). Formal arrest is not a necessary element of *Miranda* custody. *Windsor v. U. S.,* 389 F.2d 530 (5th Cir. 1968). On the positive side, the Fifth Cir-

cuit has identified four factors which should be considered in determining whether a defendant is in custody: 1) the focus of the investigation, 2) the subjective intent of the police, 3) the subjective belief of the defendant, and 4) probable cause to arrest. *Alberti v. Estelle,* 524 F.2d 1265, 1267 (5th Cir. 1975).

With respect to the first factor, the Government has stipulated that the FBI's investigation of the Texas Commerce Bank theft had focused on Nash at the time he was questioned by Agent Schreck. However, the Fifth Circuit has made clear that the fact that an investigation has focused on a defendant is insufficient by itself to create a custody situation. *U. S. v. Corollo,* 507 F.2d 50, 52 (5th Cir. 1975). *See also, Beckwith v. U. S.,* —— U.S. ——, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *Iverson v. North Dakota,* 480 F.2d 414 (8th Cir. 1973).

With respect to the subjective intent of the police, Agent Schreck testified that at the outset of the interview he did not feel that he had probable cause to arrest Nash, nor did he have authority to hold him. Schreck thus testified that Nash would have been permitted to leave at any time, if he had so requested. This testimony is strongly corroborated by the fact that Nash was not restrained in any way, even after he had confessed to the crime, but was allowed to leave after the interview was completed. Accordingly, the Court finds that Agent Schreck did not intend to hold, detain, or restrain Nash's freedom in any way.

With respect to the third factor, defendant's subjective belief, Nash testified that when the agent showed him his FBI badge and identified himself as an FBI agent, Nash became frightened and did not feel like he was free to get up and leave. Although this display of authority may very well have given Nash the subjective belief that he was no longer free to leave, the first incriminating statement of defendant, which was obtained without a waiver of *Miranda* rights, was made before the agent displayed his badge. There is no evidence that defendant felt that he was under re-

straint at the time he first incriminated himself. Conversely, the evidence indicates and the Court finds that defendant believed that he was under restraint only after Agent Schreck identified himself as an FBI agent by displaying his badge.

The final factor to be considered is whether there was probable cause for the agent to arrest Nash before he first implicated himself in the theft. If there is probable cause for arrest at the outset of an interrogation, law enforcement officers will not be permitted to circumvent the special safeguards of *Miranda* by the simple expedient of delaying the formal arrest of a defendant until after he is interrogated. *See Windsor v. U. S.,* 389 F.2d 530, 534 n. 5 (5th Cir. 1968).

Here, it is clear that Agent Schreck lacked probable cause to arrest Nash at the beginning of the interview. Schreck at that time knew that Nash was a new maintenance employee, that he was assigned to clean windows in the armored car vault area on the night of the theft, that another member of the cleaning crew had said that Nash was the last member of the crew in the armored car vault area, and that Nash had a relatively large amount of money on him when he came to work on February 20, the day following the theft. While these facts would certainly be sufficient to raise a reasonable suspicion about Nash and to cause the FBI agent to focus his investigation on defendant, nevertheless, all of these facts involve innocent activity on the part of defendant and would not constitute probable cause to arrest him. Accordingly, the Court finds that there was no probable cause to arrest defendant at the outset of the interview.

This finding, however, does not end the Court's consideration of the probable cause factor. The Court must also consider what effect should be given the telephone call, which Agent Schreck received during the middle of the interview, whereby he was informed that Nash had exchanged a large sum of money in coins for paper currency a short time before the bank closed on the day of the theft. Although this added piece

of information brought Agent Schreck much closer to the threshold of probable cause, the Court cannot say that it was sufficient to raise Schreck's suspicions to the level of probable cause. Even if the information gained by the telephone call had been sufficient to give Agent Schreck probable cause to arrest Nash, the Court is of the opinion that such fact would be entitled to little weight under the circumstances of this case for the reasons which follow.

■ It is clear that there was no attempt to circumvent the restrictions of *Miranda* by deliberately delaying the arrest of Nash until after a confession was obtained because even after Nash had confessed, he was not arrested but was allowed to go home. Additionally, there is no evidence that the telephone call changed the tone or atmosphere of the interview. The only significant change in the character of the interview occurred when Nash first incriminated himself and Schreck identified himself as an FBI agent.

To summarize, the Court has found that the FBI agent had no intent to restrain Nash in any way, that Nash was not under the belief that he was being restrained until after the FBI agent displayed his badge, that the interrogation had been in progress for a relatively short period of time (45 minutes) when the first incriminating statement was made, that the interrogation was conducted at Nash's place of employment during his working hours, and that Nash was permitted to leave after the interrogation was completed. On these facts, the Court concludes that defendant was not in custody at the time he made his first incriminating statement and that the inherently coercive aspects of a custodial interrogation had not been brought to bear upon him. Therefore, the special requirements of *Miranda* do not apply to the first incriminating statement and that statement is admissible.

Having determined that Nash's first confession was not illegally obtained, the Court must next examine the second confession.

In considering the latter, the Court notes that once the first incriminating statement was made, the ensuing interrogation proceeded under circumstances which were custodial in character. After Nash implicated himself in the theft, Agent Schreck identified himself as an FBI agent by displaying his FBI badge. Nash testified that this display caused him to become frightened and to feel that he was no longer free to leave. Moreover, once Nash confessed, Schreck clearly had probable cause to arrest him.

■ The Government, however, relies on the fact that immediately after Nash first incriminated himself, Schreck apprised Nash of his *Miranda* rights. Schreck read a waiver of rights form to Nash and then handed the form to defendant for Nash to read himself. Four minutes after the form was handed to him, Nash indicated that he desired to waive his *Miranda* rights by signing the form.

■ Counsel for defendant has contended that the waiver was not made knowingly, intelligently, and voluntarily because Nash has a subnormal mentality. Nash was evaluated by a psychologist of his counsel's choice. The psychologist found that defendant had a Verbal I.Q. of 71, a Performance I.Q. of 89 and a Full Scale I.Q. of 78, each of which is above the defective range which is demarcated by a score of 70. Nash, who is 18 years old, was found to have the vocabulary of a fourth grader with a sporadic knowledge of words up to the level of an eighth or ninth grader.[2] In open court defendant was able to read slowly the waiver of rights form. Nash admitted that no promises, threats, or physical force were used to persuade him to sign the waiver. Defendant relies solely upon his mental subnormality to invalidate the waiver.

The Court finds that defendant was not so mentally deficient as to be absolutely incapable of making a waiver or to be incapable of making a waiver under the facts of this case. Rather, the Court finds that defendant knowingly, intelligently, and vol-

2. See Defendant's Exhibit # 1.

untarily waived his *Miranda* rights. *See Lavallis v. Estelle,* 370 F.Supp. 238 (S.D. Tex.1974). Accordingly, the Court concludes that the second, more detailed confession was obtained in compliance with *Miranda* and is also admissible.

For the foregoing reasons, it is ORDERED that defendant's Motion to Suppress be, and the same hereby is, DENIED.

This Memorandum and Order constitutes the Court's findings of fact and conclusions of law.

The Clerk shall file this Memorandum and Order and send a copy to counsel.