UNITED STATES,

v.

Robert AIKENS, Defendant.

Criminal No. 98–94(PLF).

United States District Court,
District of Columbia.

June 3, 1998.

G. Bradley Weinsheimer, Assistant U.S. Attorney, Washington, DC, for U.S.

L. Barrett Boss, Federal Public Defender for DC, Washington, DC, for Robert Aikens.

## OPINION

PAUL L. FRIEDMAN, District Judge.

Defendant Robert Aikens, a prior convicted felon, is charged with unlawfully and knowingly receiving and possessing a firearm, a Taurus .38 caliber revolver, and unlawfully and knowingly receiving and possessing a .38 caliber ammunition, which had been possessed, shipped and transported in and affecting interstate and foreign commerce, in violation of 18 U.S.C. § 922(g)(1).

This case is before the Court on motions to suppress tangible evidence and statements. The Court held an evidentiary hearing on May 7 and 11, 1998. Officer Tommy Miller testified for the government, and defendant Robert Aikens, Glenda Aikens (his mother), and Dr. Lanning Moldauer, an expert in the field of psychology, testified on behalf of the defendant.

## I.  FINDINGS OF FACT

### A.  *The Arrest Of Mr. Aiken*

The facts surrounding Mr. Aiken's arrest are largely undisputed.  In fact the only matter on which there is any factual dispute is whether one of the arresting officers hit or otherwise assaulted the defendant during the course of the arrest.  Based on the testimony presented at the motions hearing, the Court finds the relevant facts to be as follows.

On February 25, 1998 at approximately 5:10 p.m., Officer Tommy Miller and Officer Horn of the Metropolitan Police Department Gun Recovery Unit observed the defendant in the 1200 block of 18th Street Northeast standing in the middle of the street beside a pick-up truck.  Both officers were in a green unmarked Chevy Lumina police car.  Officer Allen Ramadan was in a separate white unmarked Chevy Lumina police car.  Both unmarked police cars had blue police tags and a police siren light "bubble" on the dashboard.  Officer Miller was in plain clothes, but was wearing a badge around his neck, a vest and a blue jacket with the words "POLICE" written on the front and "MPD" on the sleeve of the jacket.  Officers Ramadan and Horn were similarly attired.

Officer Miller saw the defendant standing in the middle of the street on the passenger side of the pick-up truck with his hand inside the window.  Officers Horn and Miller drove towards the pick-up truck.  The defendant turned and appeared to notice the unmarked police car coming in his direction.  Officers Horn and Miller were approximately a half a block away when Officer Horn saw the defendant quickly back away from the pick-up truck.  The pick-up truck proceeded to move toward the unmarked police car, as the defendant turned and walked quickly away in the opposite direction.

Officer Horn stopped and got out of the vehicle and called after the defendant, stating, "Sir, sir," indicating that the defendant should stop.  As Officer Horn yelled at the defendant, Officer Miller observed the defendant begin to run, grabbing his waist band with his right hand.  Officer Miller then stated to the defendant, "Don't do it," meaning that the defendant should not pull out a gun.

At that point, the officer had not seen a gun on defendant's person.

As the defendant ran away from Officers Horn and Miller, Officer Miller began to give chase on foot.  Officer Miller eventually observed the defendant make a left turn into an alley and then heard a loud thump, like metal hitting against metal.  Officer Miller drew his gun and peeked cautiously around the corner into the alley.  As Officer Miller turned the corner, he observed defendant in the alley just beyond a metal trash bin or can, still running.

Officer Miller then noticed that Officer Ramadan had parked his vehicle at the other end of the alley.  Ramadan got out of his vehicle and ran towards the defendant, yelling "Police, stop"; the defendant turned and ran in the direction of Officer Miller.  At that point, Officer Miller told the defendant to "give it up."  The defendant complied and put his hands in the air.  According to Officer Miller, Officer Ramadan reached the defendant first and grabbed him from behind and "tackled" him to the ground; Officer Miller put his knee on defendant's back to hand cuff him.  Officer Miller testified that the defendant then made a spontaneous remark, stating, "Just kill me," as he was being placed under arrest.  Officer Miller later learned that the defendant had recently been released from prison and did not want to go back and that his girlfriend just had a baby.  At the time of the arrest, Officer Miller testified that the defendant was upset and crying.

The defendant testified that Officer Ramadan did not simply tackle him but struck him with his fist and kicked him while he was on the ground; that Officer Ramadan came towards him with his gun drawn and hit him with his free hand on the right side of his head as he proceeded to put his hands in the air.  The defendant asked why he was being hit.  By contrast, Officer Miller testified that when the chase ended, there was a brief five-second tussle as both officers were trying to get the defendant's arms behind his back to handcuff him.  He testified that he did not see Officer Ramadan hit or kick the defendant, but that he was not focusing on Officer Ramadan but instead was concentrating on

**30**

the defendant's hands in order to get the cuffs on. There is no evidence other than defendant's testimony that he was hit and kicked by Officer Ramadan, and the Court finds Officer Miller's testimony the more credible.[1]

After the defendant was placed under arrest, Officer Ramadan recovered a loaded .38 caliber revolver from the trash bin in the alley. The defendant's family—his father, brother, girlfriend and baby—came into the alley. The defendant testified that he told his family members that he had been hit by one of the police officers, but neither Officer Miller nor anyone else testified that the defendant made such a statement to his family. Officer Miller allowed the defendant to hug his father and take a couple puffs from his father's cigarette to permit the defendant to calm down while waiting for the transport vehicle.

Officer Miller testified that no questions were asked of the defendant at the scene and no *Miranda* rights were given. After his arrest, the defendant was taken to the Major Narcotics Branch. The defendant testified that during the transport and processing he was not mistreated in any way by any of the police officers with whom he came in contact.

### B. *Defendant's Statement*

Officer Miller testified that he and Officer Ramadan arrived at the Major Narcotics Branch after 6:00 p.m. The defendant was already in a cell and appeared to be calm but still emotionally upset. Soon thereafter, the defendant was taken out of his cell and instructed to sit at a table in a small interview area furnished with two chairs and a table that was bolted against the wall. Officer

Miller testified that the defendant was seated at the table without hand cuffs. The other officer present was Officer Ramadan.

Officer Ramadan asked the defendant if he could read. The defendant responded, "Somewhat." Officer Miller observed Officer Ramadan put a PD 47 rights card (Exhibit 1) on the table in front of the defendant. According to Officer Miller, Officer Ramadan read the PD 47 to the defendant step-by-step. After reading each line, Officer Ramadan asked the defendant if he understood and the defendant said that he did. Officer Miller testified that the defendant did not appear to be slow during this process. Officer Miller also testified that the defendant said that he had been arrested before and that he knew what his rights were. The defendant denied making this statement.[2] The Court finds Officer Miller's testimony credible, including the testimony that the defendant stated that he had been arrested before and knew what his rights were.

Officer Ramadan flipped the PD 47 rights card over and told the defendant to answer yes or no to each question. Officer Miller testified that Officer Ramadan read the four questions on the back of the PD 47 rights card the defendant appeared to be reading along. After each question was asked, the defendant printed the word "yes" next to the question. When that process was completed, Officer Ramadan told the defendant to write his name by the "X", indicating that he was advised of his rights and that he understood them. The defendant complied by printing his name. The defendant testified, however, that he told Officer Ramadan that he did not understand what Officer Ramadan was say-

---

1. Officer Miller testified as follows on cross-examination:
   Q: Now, at the point of which he stopped by you and then Officer Ramadan tackles him, do you recall before Officer Ramadan tackles him Officer Ramadan striking Mr. Aikens in the face area or the head area?
   A: I recall him tackling him to the ground.
   Q: You don't recall what exactly Officer Ramadan did in the course of tackling him?
   A: No. I recall him tackling him.
   *   *   *   *   *   *
   Q: You don't know where Officer Ramadan's hands were placed on Mr. Aikens for the purpose of tackling.

A: No.
Q: And you don't recall Officer Ramadan putting his foot on Mr. Aikens after he had him down on the ground?
A: No, I don't, I didn't observe that.
Motions Hearing Transcript, May 7, 1998 at 67.

2. The defendant testified on cross-examination that he recalled being read his rights when he was arrested in July 1993, but on re-direct examination he stated that he did not remember if his rights were read to him at that time. The defendant testified that he did not talk to the police or give a statement when he was arrested in July 1993.

ing but that Officer Ramadan told him to write yes or no next to each question anyway. The defendant testified that he wrote yes to all the questions, just to get the process over with. While the defendant may have told Officer Ramadan that he understood his rights, the Court finds that he did not. *See infra* at 10–11, 14–15.

Neither Officer Miller nor Officer Ramadan had any weapons on their person or on the table during the interview with the defendant; there were no guns, night stick or handcuffs present in the room. Both officers were still in plain clothes, without their police jackets and bullet proof vests. The defendant was made no promises, he was not coerced into signing the PD 47, and neither officer tricked the defendant into signing the rights card. Officer Miller testified that at approximately 6:45 p.m. he marked the time and date and signed the PD 47 card and then Officer Ramadan signed the card. Officer Miller testified that the defendant was calm but still upset and that he cried and wiped his tears away at times. There were pauses during the advice-of-rights process because of the defendant's crying; the total advice of rights process took twenty to twenty-five minutes because of the short breaks that were required.

After the defendant was advised of his rights and signed the PD 47, Officer Miller told him that he was going to ask him some questions and was going to reduce his answers to writing, in his notebook. Officer Miller testified that he took out his notebook and wrote down each question he asked the defendant, then asked the question, and then wrote down the defendant's answers. After all the questions had been asked, Officer Miller testified that he gave the notebook to the defendant and went over each question and answer with the defendant so that he

understood them. Officer Miller then signed the last page and told the defendant to sign his name on the last page as well if everything was accurate. The defendant printed his name at the bottom of the statement, that is, the pages from the notebook (Exhibit 2), and Officer Miller and Officer Delpo signed as witnesses.[3]

Officer Miller testified that during the questioning process he had made a mistake on one question and crossed out a phrase and wrote down his initials so that there was no confusion. On cross-examination, Officer Miller testified that he had forgotten to write down one question ("How old was Roy?") that may have been asked by Officer Delpo. Officer Miller also testified that he asked the defendant if he was threatened or coerced into answering the questions and that the defendant answered no. He also asked the defendant if he was made any promises and the defendant answered no. Finally, he asked the defendant if he had answered the questions of his own free will, and the defendant answered yes. Officer Miller testified that the entire questioning process lasted approximately one hour.

Dr. Lanning Moldauer, an expert in the filed of psychology, testified that he assessed the defendant on April 14, 1998 and administered several objective tests to him.[4] Dr. Moldauer testified that the defendant has an IQ of 71 and reads at a second grade level, and that the defendant received lower scores on verbal tests than on non-verbal tests, which is consistent with persons who have low reading levels. Dr. Moldauer also testified that the psychological evaluation by Dr. Wilder at the Lorton Correctional Facility that was done three years earlier in conjunction with defendant's prior conviction was comparable with his own findings.[5] Like Dr.

---

3. Officer Miller testified that Officer Delpo entered the interview area during the reading of the defendant's rights and stood behind a wall, looking over a partition. After Officer Ramadan left, Officer Delpo sat in Officer Ramadan's chair.

The defendant testified that he only answered the questions he was asked because he thought the officers were going to keep hitting and beating him if he didn't tell them what they wanted to hear. In view of the defendant's testimony that he was not mistreated during transport and

processing and the Court's finding with respect to the allegations about Officer Ramadan, *see supra* at 4–5, the Court does not credit this testimony.

4. The government stipulated that Dr. Moldauer is an expert in the field of psychology.

5. Although the government pointed out that there was a discrepancy between Dr. Wilder's and Dr. Moldauer's assessment of the defendant's reading level (second grade level versus

Wilder before him, Dr. Moldauer found that the defendant has organic brain damage that affects the left hemisphere of the brain that controls verbal vocabulary.

During his assessment, Dr. Moldauer asked the defendant the meaning of the phrase "you have a right to remain silent"; the defendant responded: "I guess you can't talk unless they ask you a question." Dr. Moldauer testified that the defendant did not know that he could have had counsel during the interrogation. When questioned about the meaning of his right to counsel, the defendant said it meant "if I can't afford one [a lawyer] ... once [I] came to court [I would] get a lawyer." He did not understand the right to have counsel during interrogation.

The defendant's mother, Glenda Aikens, testified that the officials at Lorton said her son began reading at a second grade level and eventually read at a fourth grade level. According to her, he had several seizures when he was a young child and was slow and passive. With the exception of the time he was incarcerated and a few months when he was on his own, the defendant has always lived with her and her husband. He tries to read · newspapers and can pick out some words he knows, but she and her husband must explain most things to him. While he has worked as a laborer, she usually picks him up from work and helps him write checks and money orders; he does not have his own bank account. Ms. Aikens' testimony was undisputed.

The defendant demonstrated to the Court that he could not read most of the words on the PD 47 rights card. When asked to read any words he recognized on the card, the defendant testified that he only recognized the following words: "police," "warning as to your rights," and "we ask you any;" he could not even read a complete sentence, let alone the entire *Miranda* rights card. The defendant's demeanor at the time of the Court's questions demonstrated that he appeared to

be frustrated, especially when he was trying to sound out the words on the card. The Court concludes that the defendant was not feigning his inability to read; it was apparent that he could not read the card. Dr. Moldauer's testimony was also consistent with what the Court witnessed. Dr. Moldauer testified that the defendant could not have faked his inability to read; he had "conspicuous difficulties." The defendant's answers to questions in Court did not show any indication that he was faking.

In addition to its conclusion that defendant could not read the rights card, it was also apparent to the Court during the hearing that the defendant did not understand his rights or the concepts the officers tried to explain to him. While he may have appeared to understand what was being said to him verbally by Officer Ramadan, as Officer Miller testified, this Court finds that he did not. During the hearing, the Court asked the defendant a number of questions regarding what the *Miranda* rights meant to him. The Court asked the defendant, "When the officer stated that you had a right to remain silent, what does that mean to you?" The defendant testified that it meant he had to keep silent unless he was asked a question. The defendant also testified that he did not know what the word "required" meant, and that "you are not required to say anything to us...," meant that he could not say anything unless he was asked a question. The defendant testified that he did understand that anything that he said could be used against him in court. He also testified that he understood that being advised that he had a right to an attorney meant that once he came to court he could get a lawyer; he did not understand that he had a right to a lawyer during questioning. The Court credits the defendant's testimony with respect to his understanding of his *Miranda* rights. The Court finds that the defendant cannot read and did not understand his rights.[6]

third grade level), the difference is small. According to Dr. Moldauer, the defendant's reading level still places the defendant in the bottom one percent of the general population; his verbal IQ puts him in the bottom two percent.

6. Dr. Moldauer testified that even though the defendant had been read his *Miranda* rights before, "the odds of the defendant remembering rights from his prior arrest is close to zero." The defendant would be able to understand those rights, "only if they were explained in such a manner that defendant could understand. If the

Having heard the testimony of the witnesses in this case and having observed their demeanor, the Court finds Officer Miller's testimony credible. The Court also finds defendant's testimony credible with respect to his understanding of his constitutional rights. While the Court believes that the defendant was read his *Miranda* rights prior to questioning, the Court concludes that the defendant did not knowingly and intelligently waive his rights because he could neither read and comprehend them nor understand them when they were explained orally.

## II. DISCUSSION

### A. *Defendant's Motion to Suppress Tangible Evidence*

■ In order to assert the rights guaranteed by the Fourth Amendment, a defendant must establish that he had a legitimate expectation of privacy in the place searched or a proprietary interest in the property seized. *United States v. Salvucci*, 448 U.S. 83, 93, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). "When individuals voluntarily abandon property, they forfeit any expectation of privacy in it that they might have had." *United States v. Thomas*, 864 F.2d 843, 845 (D.C.Cir. 1989) (quoting *United States v. Jones*, 707 F.2d 1169, 1172 (10th Cir.1983), *cert. denied*, 464 U.S. 859, 104 S.Ct. 184, 78 L.Ed.2d 163 (1983)). "[T]he test is an objective one, and intent may be inferred from 'words spoken, acts done, and other objective facts.'" *United States v. Thomas*, 864 F.2d at 846 (quoting *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir.1973)).

■ In this case, the officers chasing the defendant heard a noise that sounded like metal against metal in defendant's vicinity in the alley, and they then observed the defendant continue to run down the alley. The gun was later found in the metal trash bin in the alley. These circumstances clearly evidence the defendant's intent to abandon the gun, and the officers' warrantless seizure of the gun from the trash bin does not implicate the Fourth Amendment. *See United States*

*v. Wider*, 951 F.2d 1283, 1285–86 (D.C.Cir. 1991) (defendant's acts of placing paper bag on steps in public courtyard and walking away from the bag constituted abandonment); *United States v. Thomas*, 864 F.2d at 846 (defendant's acts of fleeing with a gym bag into an apartment building upon seeing police, leaving bag on the floor in a public hallway of building and walking away from bag constituted abandonment).

■ The defendant also has failed to proffer any facts that would support an argument that he discarded the gun in the trash can as a result of illegal police conduct. Nor could he, since there was no illegal police conduct. A person is seized under the Fourth Amendment only when the person submits to a show of police authority or actually is restrained by a police officer's physical force. *California v. Hodari D.*, 499 U.S. 621, 626–27, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). The mere purposeful approach of police officers, as in this case, is not a seizure. *Florida v. Bostick*, 501 U.S. 429, 434–35, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). Although the officers involved here were wearing plain clothes, it is clear from the testimony of Officer Miller that their attire indicated to the defendant that they were police officers. Yet he did not yield to their show of authority and their request that he stop, and he proceeded to flee. The Court therefore concludes that no seizure of the defendant in the Fourth Amendment sense occurred before the defendant abandoned the gun. The defendant's act of throwing the gun into a trash can in a public alley demonstrates that he intended to abandon the gun before he was seized, thus relinquishing his expectation of privacy.

As the court said in *United States v. Thomas*, 864 F.2d at 846–47:

> Thomas' decision to abandon his bag at the top of the stairs was not the product of a police chase. Rather, he fled there at his own instigation when he caught sight of the police coming into the courtyard. The

---

rights were really explained then it is possible that the defendant could have retained an understanding." Thus, it does not matter whether the defendant had heard the *Miranda* rights before.

If he did not understand those rights in the first place, he certainly would not have understood them when Officer Ramadan administered those rights again.

abandonment was therefore complete by the time the officers had any contact with him. And once the bag was abandoned, the officers did not require probable cause to search it.

*See also United States v. Washington,* 12 F.3d 1128, 1132 (D.C.Cir.1994) (police did not violate defendant's Fourth Amendment rights by seizing evidence from car which defendant abandoned after fleeing from police in car chase). The defendant's Fourth Amendment rights in this case therefore were not implicated by the officers' subsequent recovery of the gun.

### B. *Defendant's Motion to Suppress Statements*

It is undisputed that the defendant was in custody for *Miranda* purposes, that he was advised of his *Miranda* rights before any questioning by police officers, and that he was subject to interrogation by the police when the written statement was made. The only question before the Court is whether the defendant understood his *Miranda* rights and knowingly and intelligently waived them before he made the statements in response to questions by Officers Miller and Delpo.

■ The government has the burden to prove by a preponderance of the evidence that the defendant knowingly, intelligently and voluntarily waived his *Miranda* rights. *Colorado v. Connelly,* 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *United States v. Yunis,* 859 F.2d 953, 962 (D.C.Cir. 1988). The courts use an "objective standard" for evaluating the defendant's waiver and take into account education and prior experience with the criminal justice system. *United States v. Yunis,* 859 F.2d at 965. "A defendant must comprehend, for example, that he really does not have to speak; he must recognize that anything he says actually will be used by the state against him." *United States v. Yunis,* 859 F.2d at 964–65.

■ Despite defendant's own testimony and the testimony of his mother and Dr. Moldauer, the government argues that given the defendant's age (23 years old), completion of the eleventh grade, alleged ability to read and write, and his prior experience with the criminal justice system, defendant know-

ingly, intelligently and voluntarily waived his *Miranda* rights. The Court credits the testimony of Dr. Moldauer and the defendant and finds that the defendant did not understand his constitutional rights. While defendant's practical social intelligence may enable him to do certain normal every day functions with the assistance of his family, he demonstrated both to Dr. Moldauer and to the Court that he could neither read and comprehend nor understand the *Miranda* rights when explained orally. *Cf. United States ex rel Cooper v. Warden,* 566 F.2d 28, 30 (7th Cir.1977) (where defendant demonstrated in court that he understood right to counsel, there could be a knowing, intelligent, voluntary waiver); *United States v. Cox,* 509 F.2d 390, 392 (D.C.Cir.1974) (defendant's demonstrated ability to read PD 47 aloud and discuss understanding of its contents constituted knowing, intelligent, voluntary waiver); *United States v. Nash,* 414 F.Supp. 1213, 1218 (S.D.Tex.1976) (knowing, intelligent, voluntary waiver demonstrated by ability slowly to read waiver of rights form). Without an understanding of his rights, he could not and did not knowingly and intelligently waive them.

Based on the foregoing, the Court concludes that the gun was abandoned and was properly seized and that the defendant did not understand his *Miranda* rights when they were administered to him. The Court therefore denies defendant's motion to suppress tangible evidence and grants defendant's motion to suppress statements.

An Order consistent with this Opinion shall be issued this same day.

SO ORDERED.