OPINION
BOGGS, Circuit Judge.
Following a jury trial, Petitioner Shannon Shields was convicted of (1) kidnapping resulting in the death of the victim, in violation of 18 U.S.C. § 1201(a); (2) carrying and using a firearm during and in *809 relation to kidnapping, in violation of 18 U.S.C. § 924(c); and (3) attempted escape, in violation of 18 U.S.C. § 751(a). The district court determined that Shields was mentally retarded and thus ineligible for the death penalty under 18 U.S.C. § 3596. Shields was sentenced to consecutive terms of life, ten years, and five years in prison, respectively. Pursuant to 28 U.S.C. § 2255, Shields now asserts that even though trial counsel argued that Shields’s confession “was not voluntary” and that “coercive police activity overbore [his] will,” trial counsel provided constitutionally ineffective assistance by failing to argue in addition—before the very same trial judge—that Shields’s mental retardation prevented his waiver of his Miranda rights from being “knowing and intelligent.”
A waiver of Miranda rights must be made “voluntarily, knowingly, and intelligently.” Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Mental retardation alone, however, does not prevent a defendant from making a valid waiver of Miranda in order to confess to a crime. And even if Shields’s trial counsel had argued that it did, Shields cannot show a reasonable likelihood that the district court would have granted Shields’s motion to suppress. We therefore affirm the denial of Shields’s motion for post-conviction relief.
I

The Kidnapping

According to eyewitness testimony at trial, at approximately 10:20 p.m. on May 19, 2004, Shields and his cousin Sonny approached a man named Jerrell Lott as he exited a grocery store in Memphis and got into his car. Either Shields or Sonny pointed a gun at Lott while the other demanded that Lott unlock his car and let them inside. Lott complied. The gunman kept the gun to Lott’s head as they drove away. Surveillance video revealed that Sonny used Lott’s ATM card to withdraw funds from an ATM approximately one hour after the initial carjacking.
Shields and Sonny then drove to the house of Sonny’s friend Lendzo Parker. According to Parker’s testimony, Shields and Sonny explained that they had robbed Lott and needed Parker’s help to get rid of the car. Parker and Parker’s friend James Stafford agreed to follow behind Shields and Sonny as they drove away in Lott’s car with Lott trapped in the trunk. Two other witnesses testified to their departure.
Parker testified that the men crossed into Arkansas, stopped at a gas station, and bought a gas can, which Stafford filled at the pump with gasoline. The men then resumed driving, first on a secluded paved road and then on an unpaved road. They parked by a field. Shields and Sonny got out of Lott’s car, opened Lott’s trunk, and directed Lott to get out. Lott begged for his life. When Lott attempted to run away, Sonny pulled a gun and fired at him. Shields grabbed the gun and ran after Lott, firing additional shots as he ran. Sonny followed. Parker testified that he heard several more shots before Shields and Sonny returned to the cars. The men then drove away in both cars, leaving Lott’s body behind.
After arriving in Memphis, however, Sonny noticed that the cap to the gas can was missing, so the four decided to return to the field to find it. They were not successful, so they drove back to Memphis. They then looked for a place to burn Lott’s car. Settling on a location near Hernando Street and Kerr Street, Shields parked the car in a field and lit it on fire, suffering bums to his arm and face in the process.
Lott’s car was found by the police. Lott’s body was later found in Crittenden County, Arkansas, by the farmer who owned the field in which the body had been left. According to a medical examiner, Lott had been shot five times including once in the head, was wearing only his underwear, *810 and was badly burned after having been set on fire.

The Investigation

Local television stations began airing surveillance-camera footage from the grocery store showing Shields and Sonny as they approached Lott’s car. On May 21, Sonny turned himself in to the Memphis Police Department, making statements that implicated himself, but largely blaming Shields. United States v. Shields, 480 Fed.Appx. 381, 385 (6th Cir. 2012).
Shields, meanwhile, went to his aunt’s home, where he explained that he had been working on a car and been injured in a car-battery fire. Shields changed clothes and shoes and asked for a ride to Grenada, Mississippi, where he could meet up with his girlfriend. Shields told his girlfriend that he had been injured in a barbecuing accident. His girlfriend took Shields to a nearby hospital, where he checked in under the pseudonym “Willie Oliver.” The hospital transferred him to a burn center in Greenville, Mississippi, where Shields continued to use the pseudonym.
Sonny told the police where to find Shields. Local law enforcement took Shields into custody in Greenville, and Memphis Police Detective Joseph Pearl-man and Sergeant Jasper Clay drove down to Greenville on May 24. When Pearlman and Clay arrived, Shields began to tell them, unprompted, that he was not a killer and that he wanted to tell them his side of the story. Clay stopped Shields and proceeded to go with him to the U.S. Marshals’ office at the federal courthouse in Greenville, where Shields was due to be arraigned.
After giving Shields an opportunity to eat, Pearlman and Clay entered his holding cell and presented Shields with a Miranda-waiver form that lists the Miranda rights.[1] Pearlman testified that his practice was first to turn the form over and ask the suspect about his education level, literacy, mental disabilities, and any recent pain-medicine or drug consumption, and then to ask the suspect to read the first line of the form out loud and the remainder of the form silently. Pearlman testified that he followed this practice with Shields, who read the first line of the form aloud.
Shields then said “I know my rights, I’ve been arrested before, I know I don’t have to talk to you if I don’t want to.” Appellant’s Br. 9. Pearlman testified that Shields then said, “I can stop talking any time I want to stop.” Shields also printed his name on the Miranda waiver form and signed it. According to Pearlman, Shields specifically stated “I understand my Miranda rights,” and he “was very cognizant and very aware and very eager to talk.”
On the back of the Miranda ■ waiver form, Pearlman had noted that Shields told him that he had been in special-education classes in high school, that he had dropped out in the 11th grade, and that he “could read some but was not that good at it.” Shields had also told the detectives that he had taken pain medication for the burns he had suffered five days earlier.
Shields then gave a 38-minute tape-recorded statement, which would be played for the jury at trial, implicating himself in Lott’s kidnapping. Shields admitted, among other things, that he was at the scene of the carjacking, that he rode to the
*811 ATM, and that he was present when Sonny fired his gun at Lott and when Sonny set Lott’s body on fire. Some of Shields’s statement sought to shift blame to Sonny: Shields said, for example, that he did not know that Sonny had a gun until the two were approaching Lott’s car, that Sonny threatened to kill Shields if he did not go along with the plan, that only Sonny fired the gun in the field, and that only Sonny was responsible for burning Lott’s body.[2]

Shields’s Trial

Shields stood trial in the United States District Court for the Western District of Tennessee, with Judge Bernice Bouie Donald presiding. On August 19, 2008, Shields’s trial counsel moved to suppress Shields’s confession on the grounds that it was coerced and not voluntary. After this motion was made, and before Judge Donald ruled on it, Judge Donald held a pretrial hearing to determine whether Shields was mentally retarded so as to preclude the government from seeking the death penalty. The hearing spanned ten full days, including five days in November 2008 and five days in January 2009. Shields and the government each called both expert and lay witnesses to testify to Shields’s mental capacity and ability to function.
Both parties submitted post-hearing memoranda. The parties stipulated to the definition of mental retardation in the Diagnostic and Statistical Manual of Mental Disorders (Fourth Edition-Text Revision) (DSM-IV-TR). According to the DSM-IV-TR, a finding of mental retardation has three requirements: (1) significantly sub-average intellectual functioning as demonstrated by an IQ of approximately 70 or lower on an individually administered IQ test; (2) concurrent deficits or impairments in present adaptive functioning in at least two of various areas such as communication, self-care, work, and so on; and (3) onset of the mental retardation before age eighteen.-
On May 11, 2009, Judge Donald issued a 33-page order finding by a preponderance of the evidence that Shields was mentally retarded and thus ineligible for the death penalty. Among many other factors, Judge Donald considered Shields’s Wechsler-bat-tery IQ scores, which are summarized as follows:[3]
IO Test Year Full Scale Score Verbal IO Performance IO
WISC-R 1989 69 69 72
WISC-R 1992 73 68 82
wisc-m 1995 70 69 75
WAIS-R 1997 68 67 70
WAIS-III 2005 68 73 68
Judge Donald noted that when Shields was sixteen, “the Social Security Administration' determined that [Shields’s] IQ *812 scores were at the high end of the mentally retarded range and found several deficits in adaptive functioning,” qualifying Shields for Supplemental Security Income (SSI) payments. When Shields was twenty-one, the Social Security Administration concluded that Shields was mentally retarded but that he “did not qualify for [additional] disability benefits because ... there were occupational roles [that he] was capable of fulfilling.” Judge Donald also found that Shields had sporadic employment history including jobs as a restaurant dish washer and a furniture mover, although “as an adult he has had no apparent ambition or goals in life” and “has always depended on a woman benefactor.”
Only after this extensive inquiry into Shields’s mental capacity did Judge Donald return to a number of Shields’s pretrial motions including his motion to suppress his confession. Judge Donald held an evi-dentiary hearing on the motion to suppress on August 13, 2009, and denied the motion four days later. Notably, although Shields’s motion sought to suppress his confession on the grounds that it was not voluntary, without arguing that it was not knowing and intelligent, Judge Donald specifically found not only that Shields confessed of his own free will—i.e., voluntarily—but also that Shields had made a knowing an intelligent waiver under Miranda:
After Defendant had eaten his lunch, the officers inquired of Defendant how he felt and whether he was in pain. Defendant responded that he was in some pain, but felt comfortable and well enough to talk to the officers. After the officers were satisfied that Defendant was both mentally and physically able to make a statement, Sgt. Clay apprised Defendant of his Miranda rights. Defendant was not in cuffs or other restraints, but he was in a cell along with Detective Pearlman and Sgt. Clay.
Defendant was alert and attentive and manifested no outward signs of being incoherent or otherwise incapable of giving a knowing, intelligent, and voluntary waiver of his rights. Using the term “Miranda” specifically, Defendant stated that he knew his rights and wanted to make a statement. After being read his Miranda rights, Defendant signed a waiver of rights form. Detective Pearl-man and Sgt. Clay witnessed Defendant’s signature at approximately 1:00 p.m. Defendant thereafter proceeded to make a statement about his involvement in the alleged offenses. Officers tape recorded their questions and Defendant’s answers. At a few points it was necessary to stop the tape briefly to inquire whether it was time for Defendant’s court appearance, but these pauses did not result in the omission of any material parts of Defendant’s interview.
In her order, Judge Donald “credited] Detective Pearlman’s testimony that [Shields] did not manifest signs of being incapable of a knowing, intelligent, and informed waiver of his rights” (emphasis added) when he agreed to speak to Pearl-man and Clay. Even though Shields’s defense counsel did not mention Miranda in his motion to suppress Shields’s statement, Judge Donald apparently conducted a full Miramto-waiver inquiry and concluded that nothing stood in the way of Shields’s making an effective Miranda waiver and confession.
Jury trial commenced on October 19, 2009, and the jury returned a guilty verdict on October 23, 2009. Shields’s trial counsel did not object to the playing of Shields’s confession video at trial other than objecting to the use of portions of the video that were hard to understand, and to the accuracy of the captions superimposed *813 on the video during those portions. Shields, 480 Fed.Appx. at 388 n.5.
A panel of our court affirmed Shields’s conviction, over Judge Clay’s dissent, in 2012. Id. at 381. Shields filed a motion to vacate his sentence on September 30, 2013. The district court denied Shields’s motion on April 8, 2015, and denied a certificate of appealability. In 2016, noting that Judge Clay had dissented on the issue of whether Shields’s Miranda waiver was knowing and intelligent, we granted a certificate of appealability on the sole issue of whether trial counsel was ineffective in failing to argue that the Miranda waiver was not knowing and intelligent.
II
We review de novo a district court’s denial of a § 2255 motion to vacate a sentence for ineffective assistance of counsel. See Pough v. United States, 442 F.3d 959, 964 (6th Cir. 2006).
To be entitled to relief, Shields has the burden of proving by a preponderance of the evidence that he received constitutionally ineffective assistance of counsel. Ibid. Under Strickland v. Washington, a claim of ineffective assistance requires showing that “counsel’s representation fell below an objective standard of reasonableness,” 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and that there is a “a reasonable probability that, but for counsel’s unprofessional 'errors, the result of the proceeding would have been different,” id. at 694, 104 S.Ct. 2052. “A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Ibid. “It is not enough ... to show that the errors had some conceivable effect on the outcome of the proceeding.” Id. at 693, 104 S.Ct. 2052. Counsel’s errors must be “so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.” Id. at 687, 104 S.Ct. 2052; see also Harrington v. Richter, 562 U.S. 86, 112, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (“The likelihood of a different result must be substantial, not just conceivable.”).
A. Trial Counsel’s Performance Was Not Objectively Deficient
An attorney’s performance is deficient under Strickland when, “in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.” 466 U.S. at 690, 104 S.Ct. 2052. An attorney is “strongly presumed to have rendered adequate assistance.” Ibid. An attorney’s action that “might be considered sound trial strategy” is not constitutionally deficient. Id. at 689,104 S.Ct. 2052.
Shields argues that his trial counsel was ineffective for failing to move to suppress Shields’s confession on the grounds that Shields’s mental retardation prevented Shields from making a knowing and intelligent Miranda waiver. True, Miranda has two dimensions: “voluntariness and comprehension.” Garner v. Mitchell, 557 F.3d 257, 263 (6th Cir. 2009) (en banc). And trial counsel attacked only the volun-tariness of Shields’s Miranda waiver and not his comprehension of it.
But mental retardation itself does not prevent a defendant from comprehending—and choosing to waive—Miranda rights, and Shields points to no case law to tell us otherwise. See Garner, id. at 266 (where defendant with IQ of 76 “was not so mentally retarded that officers had reason to believe that he could not understand his rights,” and where his “conduct, speech, and appearance at the time of interrogation indicated that his waiver was knowing and intelligent, notwithstanding .his diminished mental capacity,” defendant’s confession to setting house fire that killed five children was not obtained in *814 violation of Miranda). Shields has the burden to carry and we have never held that a mentally retarded person like Shields (i.e., a person with an IQ of 70 or below, with adaptive deficits, whose mental retardation manifested itself by age eighteen) lacks the capacity to make a knowing and intelligent Miranda waiver based on mental retardation alone. Cf. United States v. Macklin, 900 F.2d 948, 952-53 (6th Cir. 1990) (noting that the right to make meaningful statements like confessions is based on the same free will that forms the basis “for the myriad valuable rights of citizenship” like the right to vote, to testify, to contract, or to conduct a defense, and that defendants who have “the ability to avail themselves of the incidents of citizenship” should not be excluded from the rights or the responsibilities of citizenship “absent a compelling showing” that they are capable of exercising neither). Shields’s trial counsel therefore cannot be held to be deficient for failing to argue that Shields’s mental retardation would intrinsically prevent him from making a valid Miranda waiver.
Importantly, on direct appeal, even though the panel did not have to consider the question of whether Shields’s confession was not knowing and intelligent (because trial counsel did not raise it), the panel nevertheless did consider the issue. Judge Merritt wrote for the majority:
[E]ven absent waiver, Defendant’s claim fails on the merits. In Garner v. Mitchell, 557 F.3d 257, 264, 270-71 (6th Cir. 2009), this Court held that a defendant in the “ ‘borderline range of intelligence’ ” who also suffered from a troubled upbringing and poor education knowingly, intelligently, and voluntarily waived his Miranda rights. Noting that “diminished mental capacity alone does not prevent a defendant from validly waiving his or her Miranda rights,” we reasoned that this factor must instead “be viewed alongside other factors, including evidence of the defendant’s conduct during, and leading up to, the interrogation.” Id. at 264-65.
[...]
Defendant’s cooperativeness and coherency thus demonstrate that he grasped both the nature of the charges against him and the consequences that could flow from his interactions with police to effectuate a knowing, intelligent, and voluntary waiver of his Miranda rights. See id. at 265.
Shields, 480 Fed.Appx. at 388-89.
In his brief, Shields argues that if he has difficulty understanding things like “following multi-step recipes, paying bills, managing a checkbook, ... the dangers of leaving a hot iron unattended, or how credit cards work” (although Shields apparently understood enough to acquire and use credit cards in his own name even if he has not claimed responsibility for paying his credit-card bills), then “it is difficult to see how Shields could understand and appreciate complex abstract concepts like the full measure of his rights under [the] Fifth Amendment—much less what it means to ‘waive’ those rights or the dangers of doing so.” Appellant’s Br. 32.
In support of this argument, Shields relies on United States v. Betters, 229 F.Supp.2d 1103, 1107 (D. Or. 2002); United States v. Robles-Ramirez, 93 F.Supp.2d 762, 766 (W.D. Tex. 2000); and United States v. Aikens, 13 F.Supp.2d 28, 34 (D.D.C. 1998). These cases are not the law in our circuit but would not help Shields even if they were. In Betters, the defendant’s Miranda waiver was held invalid where the mentally ill defendant was “highly intoxicated from alcohol, possibly under the influence of another drug, off her psychotropic medications, and likely in a manic state” when she purported to waive Miranda. In Robles-Ramirez, the *815 defendant—who had an estimated IQ of either 66 or 72—spoke only Spanish, could neither read nor write, did not recognize the letters of the alphabet, functioned at a second-grade level in arithmetic, and functioned at a preschool level in literacy. The defendant there also suffered from a neurological impairment and generally suffered impairment in his ability to understand words. 93 F.Supp,2d at 766. And in Aikens, the defendant was functionally illiterate, “did not know what the word ‘required’ meant,” 13 F.Supp.2d at 32, and could not understand Miranda rights even when explained orally. What all these cases reflect is the general principle that the validity of a Miranda waiver is based on the totality of such circumstances as the defendant’s background, education, and conduct during the interrogation. See Garner, 557 F.3d at 264-65. But none of these cases help Shields make his case that he did not knowingly and intelligently waive Miranda, or that his mental retardation somehow precluded him from doing so. Instead, the facts indicate that Shields knew his Miranda rights, understood how to waive or invoke them, and—more than simply acquiescing to a law enforcement officer’s invitation to talk—asserted in considerable and correct detail his knowledge of the rights he wished to waive in order to make a confession. Thus, Shields has not carried his burden of proving that his trial counsel was constitutionally ineffective for failing to argue that Shields’s mental retardation made his Miranda waiver unknowing or unintelligent.
B. Shields Cannot Show Prejudice
Moreover, Shields cannot possibly show prejudice as Strickland requires. Judge Donald’s eight-page order denying Shields’s motion to suppress makes clear that Judge Donald did in fact consider not only the voluntariness of Shields’s confession but also whether it was knowing and intelligent under Miranda. To prevail, Shields would have to show a reasonable likelihood that if his trial counsel had simply thought to argue to suppress Shields’s statement as unknowing or unintelligent, Judge Donald would have suppressed it— and that the result of Shields’s trial would have been different. But the likelihood that Judge Donald would have suppressed Shields’s confession if only Shields’s trial counsel had uttered one of the magic words “Miranda” or “knowing” or “intelligent” is essentially nil in light of the fact that Judge Donald—who knew all the facts concerning both Shields’s mental faculties and his confession—expressly ruled that Shields’s confession was voluntary and knowing and intelligent. Judge Donald denied the motion to suppress only after holding both a ten-day evidentiary hearing on Shields’s mental capacity and a separate evidentiary hearing on the motion to suppress.
CONCLUSION
In sum, the district court properly denied Shields’s motion to vacate his sentence. We therefore AFFIRM,

. The waiver form articulated the rights as follows: (1) "You have the right to remain silent.” (2) "Anything you say can be used against you in court.” (3) "You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning,” (4) "If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.” (5) "If you decide to answer questions now without your lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.”

. Sonny and Shields each maintained that only the other of the two shot Lott.

. Shields was bom on May 6, 1981. The WISC is the Wechsler Intelligence Scale for Children; the WAIS is the Wechsler Adult Intelligence Scale. The "-R” suffix indicates a revised version; ‘‘-111’’ indicates a third edition, The Wechsler IQ tests gained widespread currency in the 1960s. Although some of the IQ scores are over 70, Judge Donald considered that the scores were sufficiently low to satisfy the DSM-IV-TR standard. As part of her reasoning, Judge Donald considered the Flynn Effect, a phenomenon by which observed IQ scores generated by a given IQ test are said to increase, on average, by approximately three points for every ten years that the IQ test has been on the market. While Judge Donald declined to use the Flynn Effect to impose a mechanical downward adjustment of any of the IQ scores, the Flynn Effect could account for much of Shields’s four-point score increase between the 1989 and 1992 WISC-R test administrations.