**File Name: 12a0490n.06**

**NOT RECOMMENDED FOR PUBLICATION**

No. 10-5097

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*May 11, 2012*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | **ON APPEAL** FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| SHANNON SHIELDS, | ) | WESTERN DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE:     MERRITT, CLAY, and SUTTON, Circuit Judges.

**MERRITT, Circuit Judge**.   This is a direct appeal from a jury conviction for: (1) kidnapping resulting in the death of the victim, in violation of 18 U.S.C. § 1201(a); (2) carrying and using a firearm during and in relation to kidnapping, in violation of 18 U.S.C. § 924(c); and (3) attempted escape, in violation of 18 U.S.C. § 751(a).  The defendant-appellant, Shannon Shields, received a sentence of life imprisonment for the kidnapping charge, ten consecutive years of incarceration for the firearms charge, and five consecutive years of incarceration for the escape charge.  A prior adjudication that determined Defendant to be mentally retarded rendered him ineligible to receive the death penalty.  Defendant appeals the jury's verdict and his sentences on several grounds: (1) that there is insufficient evidence to sustain Defendant's convictions for the kidnapping and firearms charges; (2) that the District Court improperly admitted certain testimony

and otherwise denied Defendant a fair trial; (3) that the District Court erred in denying Defendant's

motion to suppress incriminating, post-arrest recorded statements that he made to the police; and (4)

that Defendant's sentence of life imprisonment for the kidnapping charge, imposed pursuant to a

statutorily mandated minimum sentence, is disproportionate to his level of culpability and therefore

violates the Eighth Amendment's bar against cruel and unusual punishment. These claims of error

are insubstantial. The evidence against Defendant is very strong.

## I. Background

The pertinent facts are as follows. On the evening of May 19, 2004, Defendant and his

cousin, Sonny Shields, carjacked and abducted Jerrell Lott at the Corner Grocery Store in Memphis,

Tennessee. In addition to surveillance camera footage confirming that Defendant and Sonny Shields

approached Lott's car (a silver 1994 Mitsubishi Diamante) on that evening, there was one eyewitness

to the crime itself, a thirteen year-old boy named Tony Tapplin. At trial, Tapplin testified that he

saw two men approach Lott's car once Lott, whom Tapplin recognized as his neighbor, had left the

store and gotten back inside the vehicle. According to Tapplin, the men spoke briefly with Lott, at

which point one of the men pulled out a gun and pointed it at Lott while the other ran around to the

passenger side and demanded that Lott unlock the car and let him inside. Lott complied. Tapplin

further testified that the man holding the gun then jumped into the backseat, and that Lott drove away

while the man held the gun to the back of his head. On May 25, six days after witnessing the

carjacking, Tapplin identified Sonny Shields from a police photo spread as the man who had pulled

the gun on Lott. However, Tapplin was unable to identify Sonny Shields a second time when police

showed him a new photo spread on May 30, five days later, and he was never able to identify Defendant as the second perpetrator.

The testimony of other witnesses pieced together events subsequent to Lott's carjacking and abduction and culminating in his murder. Soon after leaving the Corner Grocery, Defendant and Sonny Shields pulled over, forced Lott to strip to his underwear, beat him, and locked him in the trunk of his car. After locating Lott's ATM card, Defendant and Sonny Shields then drove to a local bank and used the card to withdraw $800 in cash.[1] Next, they drove across town to the house of Sonny Shields' friend, Lendzo Parker, at 917 Polk Street. Parker testified at trial as to the events that occurred at the Polk Street address. According to him, Defendant and Sonny Shields arrived at the house around midnight in a silver Mitsubishi Diamante. He further testified that Defendant, upon exiting the car, announced "I got a nigger in the trunk," prompting Sonny Shields to explain to Parker that he and Defendant had just robbed a man, that the man had seen their faces, and that they needed Parker to help them get rid of the car. Parker agreed. Parker and two other witnesses who were also present at the Polk Street address, Parker's sister, Lauren Parker Turner, and Parker's friend, Kevin Jordan, testified that they also observed Defendant flashing a large wad of cash. Jordan further testified that Defendant told him to stay away from the Diamante because it was "hot." Sometime thereafter, Defendant and Sonny Shields left 917 Polk Street in the Diamante, with Lott still trapped in the trunk. Parker and Parker's friend, James Stafford, followed behind in Parker's Honda. Both Turner and Jordan witnessed and testified to the cars' departure.

---

[1] At trial, a records custodian for the bank testified that the bank's ATM video camera captured an individual withdrawing money from Lott's bank account on the evening of May 19, 2004.

Parker's trial testimony provides an account of what happened next. After departing from 917 Polk Street, the four men crossed the Mississippi River into Arkansas before stopping at a gas station to buy gas and a plastic gas can. Stafford filled up the latter with gas at the pump. The four men then left the gas station and drove for some time before turning onto a secluded road, and finally, parking on an adjoining unpaved field road. Once parked, Defendant and Sonny Shields exited the Diamante, opened the trunk, and directed Lott to get out. Lott begged for his life, to no avail. When Lott attempted to run away, Sonny Shields drew his gun and fired at the fleeing figure. At this point, Defendant grabbed the gun from Sonny, and exclaimed "You can't do nothing right" before running after Lott, firing shots as he ran. Sonny Shields followed. Parker testified that, although the three men disappeared from his line of sight, he heard several more shots before Defendant and Sonny Shields returned to the parked cars. Sonny Shields, shoeless and carrying the pistol, collected the gas can from Stafford and walked back across the field with Defendant to burn Lott's body. After some time, Defendant and Sonny Shields returned to the cars, and all four men drove away.

On the road back to Memphis, the men stopped at a different gas station to refill the gas can. Sonny Shields noticed that the gas cap was missing and grew concerned that he had accidentally left it behind. Consequently, all four men returned to the field and searched, unsuccessfully, for the errant item. As they attempted to depart for the second time, both cars became stuck in the muddy field, forcing the men to get out and push them free, muddying their clothes and shoes in the process. Once back in Memphis, the men drove around looking for a place to burn Lott's car. They eventually stopped at a location near Hernando and Kerr streets, where Sonny Shields got out of the

Diamante and joined Parker and Stafford in the Honda. Defendant proceeded to burn the Diamante in a nearby field. The car exploded as it burned, injuring Defendant's arms and face. He ran back to the others, yelling that he was hurt, and directed them to take him to his aunt's house. Sonny Shields, Parker, and Stafford complied and dropped Defendant off at his aunt's address sometime between 3a.m. and 4a.m. on the morning of May 20. Defendant's aunt, Stephanie Long, greeted him at the door and immediately noticed that he was muddy, burned, and reeking of gasoline. Defendant told his aunt and his aunt's husband, Tony Long, that he had been working on a car and had gotten injured when the car's battery caught fire. After changing clothes and shoes, Defendant asked his aunt to drive him to a place where he could meet up with his girlfriend, Frenchetta Leavy. His aunt agreed, and Defendant and his aunt met Leavy in Grenada, Mississippi. Defendant told Leavy that he'd injured himself in a barbecuing accident.[2] Leavy then drove Defendant to a nearby hospital, where he checked in under the pseudonym "Willie Oliver." He continued to use this false name when the hospital transferred him to a burn center in Greenville, Mississippi.

The Memphis Police Department became aware of Defendant's involvement in Lott's abduction and murder when Sonny Shields turned himself in to local investigators on the evening of May 21, 2004. By this point, the police investigation was already underway.[3] Sonny Shields made a number of inculpatory statements, but largely shifted the blame to Defendant. He also told

---

[2] Once in custody, Defendant told Leavy that he had been present when Sonny Shields shot a man and that he'd gotten burned when he set someone's car on fire.

[3] Police officers had already found both Lott's body and the charred Diamante, and local television stations had begun airing the surveillance camera footage showing two men approaching Lott's car in the Corner Grocery parking lot.

the police where they could find Defendant. Consequently, the Sheriff's Department in Washington County, Mississippi, took Defendant into custody on the evening of the same day. Three days later, on May 24, Memphis police detectives Joseph Pearlman and Jasper Clay drove to Greenville, and, pursuant to a federal warrant, interviewed Defendant as he waited in a holding cell prior to his initial court appearance. Pearlman and Clay advised Defendant of his *Miranda* rights, and he waived them both orally and in a written statement. He thereafter made a tape-recorded statement that was self-serving but incriminating. Defendant admitted to being present throughout Lott's carjacking, abduction, and murder, but placed primary blame on his cousin, just as Sonny Shields had done to him. Defendant's statement was admitted at trial, where the jury returned guilty verdicts on all three counts of the indictment.

## II. Discussion

### 1. Sufficiency of the Evidence

The evidence is clearly sufficient to support the jury's verdict. Defendant first asserts that the government failed to adequately link him to Lott's kidnapping because the only non-accomplice eyewitness to the crime, thirteen year-old Tapplin, was never able to identify Defendant as one of the perpetrators. This argument ignores the Corner Grocery Store surveillance video showing Defendant and Sonny Shields approaching the location where Lott was sitting in his car on the evening of May 19, 2004. Tapplin, moreover, identified Sonny Shields in the first of two police photo spreads as the man who held the gun.

Second, Defendant contends that Parker's testimony was biased and that the jury should not have credited it in light of the fact that Parker testified pursuant to a plea agreement under which he

will receive a reduced sentence of twenty years imprisonment for the kidnapping charge and a dismissal of the firearms charge. The jury, however, knew of Parker's plea agreement; it was their function to judge his credibility. Further, those portions of Parker's testimony which connect Defendant to Lott's stolen Mitsubishi Diamante, and to events that transpired at 917 Polk Street on the night of Lott's abduction, are strongly corroborated by the statements of other, non-accomplice eyewitnesses. Defendant himself admitted – both to the police and to his girlfriend – that he was present in the Arkansas field when, according to Defendant, Sonny Shields shot and killed Lott.[4] Thus, even conceding the possibility that Defendant may never have pulled the trigger, there was ample evidence to convince a rational trier of fact that Defendant was guilty of the charged offenses. *See U.S. v. Henderson*, 626 F.3d 326, 341 (6th Cir. 2010).

### 2. Prejudicial Effect of Various District Court Rulings

Defendant next asserts that the District Court made a variety of rulings that unfairly prejudiced the jury against him. These include: (1) improperly allowing expert opinion testimony from a lay witness; (2) improperly allowing testimony regarding Defendant's medical treatment and use of a pseudonym to obtain such treatment; (3) refusing to permit Defendant to appear at trial in street clothes instead of prison garb; and (4) failing to sever Defendant's charge for escape from the kidnapping and firearms charges.

---

[4] Defendant also argues on appeal that his statement to the police should have been suppressed. This assertion is addressed, and dismissed, later in the opinion.

### (a) Evidentiary Rulings

Defendant contends that the District Court wrongly permitted Dale Arnold of the Arkansas State Police to highlight for the jury "what appeared to be similarities" between the tread on Defendant's muddy shoes and a photograph of the shoe prints found near Lott's body, despite lacking "specialized training in footprint or shoe identification." (Appellant's Brief at 29.) This argument lacks merit. It is true that Rule 702 of the Federal Rules of Evidence prohibits any witness from providing opinion testimony based on scientific, technical, or other specialized areas of knowledge unless that witness first qualifies as an expert. *See* FED. R. EVID. 702. However, Rule 701 supplies an important corollary: a witness may nonetheless offer lay opinion testimony that is rationally based on the witness's perception, or that will help the jury understand the testimony or determine a fact in issue, so long as it is not otherwise restricted by Rule 702. *See id.* 701.

Arnold's testimony fits squarely within the limitations contemplated by Rule 701. First, Arnold led the police discovery of Lott's body and thus had sufficient personal knowledge to testify about whether the prints in the field were similar to the tread on Defendant's shoes. And second, the jury benefitted from Arnold's testimony in light of the fact that Arnold had enjoyed significantly more time to study and compare the evidence. *See U.S. v. Zepeda-Lopez*, 478 F.3d 1213, 1222 (10th Cir. 2007). The District Court did not err by admitting it.

Defendant also asserts that the District Court improperly admitted testimony regarding Defendant's medical treatment in Mississippi, including his use of the pseudonym "Willie Oliver" to obtain such treatment. Defendant maintains that this evidence lacked probative value, as it occurred after the crime was completed, and that it unfairly prejudiced the jury against him. We

disagree. The mere fact that evidence relates to activities committed after completion of a crime does not render it inadmissible. Rather, it is elementary that post-crime evidence is admissible when it tends to show consciousness of guilt and is not unfairly prejudicial. *See e.g., U.S. v. Cody*, 498 F.3d 582, 591-92 (6th Cir. 2006). In this case, evidence that Defendant sought medical treatment well over one hundred miles from Memphis, and under a false name, tended to prove that Defendant hoped to avoid apprehension for his crimes. Further, evidence relating to the treatment itself tended to link Defendant, through his injuries, to the burning of Lott's car.

### (b) Denial of Defendant's Request to Appear in Street Clothes at Trial

Defendant next contends that the District Court denied him a fair trial by refusing his request to stand before the jury in street clothing. Although it is well-established that a trial court cannot force a criminal defendant to appear before the jury in prison garb, no compulsion was present in this case. *See Estelle v. Williams*, 425 U.S. 501, 504-05 (1970); *U.S. v. Brown*, 367 F.3d 549, 553-54 (6th Cir. 2004). To the contrary, Defendant strategically chose to appear in prison clothes, only changing his mind the first morning of trial. And while Defendant did at this point object to appearing before the jury in an orange jumpsuit, the District Court made all reasonable efforts, short of delaying trial, to accommodate him. Echoing *Brown*, this Court recently held that a trial court is not required to either furnish alternate clothing for a defendant or else delay trial, so long as the court makes clear that it would allow the defendant to change clothes if substitute attire could feasibly be made available. *See U.S. v. Williams*, 641 F.3d 758, 767 (6th Cir. 2011) (citing *Brown*, 367 F.3d at 554). The District Court clearly provided Defendant with an opportunity to change his clothes, even suggesting that Defendant's counsel borrow a jacket from a colleague on Defendant's behalf. As

such, the District Court's refusal to delay trial at the last minute did not amount to compelling

Defendant to appear in prison clothes in violation of his constitutional rights.

*(c) Failure to Sever Escape Charge from Other Charges*

Defendant also claims that the District Court prejudiced his defense by failing to sever his

charge for escape from the other charges against him. Because Defendant failed to renew his pretrial

motion to sever at the close of all the evidence, we review for plain error. *See U.S. v. Walls*, 293

F.3d 959, 966 (6th Cir. 2002). Defendant concedes that the Federal Rules of Criminal Procedure

permit the joinder of related offenses, but supports his argument by invoking a court's discretionary

ability to sever certain offenses if it appears that prejudice would otherwise result. *See* FED. R. CRIM.

P. 8(a), 14. Defendant, however, suffered no additional prejudice from a concurrent trial on all

charges. Evidence of his attempted escape would have been admissible circumstantially as tending

to prove consciousness of guilt in a separate trial on the kidnapping and firearms charges. *See U.S.*

*v. Williams*, 295 F.3d 817, 819 (8th Cir. 2002); *U.S. v. Hankins*, 931 F.2d 1256, 1261 (8th Cir.

1991). Thus, as to the joinder of counts, the District Court committed no error, much less plain

error. *See Williams*, 295 F.3d at 819.

### 3. Denial of Defendant's Motion to Suppress

Prior to trial, Defendant moved to suppress the tape-recorded statement he gave to police on

May 24, 2004, on the ground that it was not voluntary, despite Defendant's oral and written waiver

of his *Miranda* rights. The District Court denied the motion and admitted the statement at trial.

Defendant now contends, for the first time, that the District Court's pretrial adjudication of his

mental retardation, which rendered him ineligible to receive the death penalty, also invalidated his

waiver of rights because it was not made knowingly and intelligently. Defendant also asserts that, because he is mentally retarded, his statement was the product of inherent police coercion. Defendant's claim of ineffective waiver is a losing one because it both has no merit and was waived.

There is case law to support the proposition that diminished mental capacity can, by limiting a defendant's ability to understand the nature of his or her rights and the consequences of abandoning them, contribute to a determination that a waiver was invalid. *See U.S. v. Garibay*, 143 F.3d 534, 539 (9th Cir. 1998). But Defendant failed to raise this issue before the District Court, despite ample opportunity. Specifically, the chronology of events was such that Defendant, once adjudicated mentally retarded, could have filed a supplemental memorandum in support of his motion to suppress that specifically addressed the question of whether he was capable of signing a knowing, intelligent, and voluntary waiver of his rights. He did not. Defendant also did not object at trial to the admission of his statement on this basis.[5] As a general rule, this Court refuses to consider an issue on appeal that a defendant did not first raise before the District Court, except in "'exceptional cases or particular circumstances'" not present here. *See U.S. v. Pickett*, 941 F.2d 411, 415 (6th Cir. 1991) (quoting *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1461) (6th Cir. 1988), *cert. denied*, 488 U.S. 880 (1988)) (permitting appeal on the merits when both parties had extensively briefed the "wholly legal" issues at stake). Defendant has therefore waived his claim.

Further, even absent waiver, Defendant's claim fails on the merits. In *Garner v. Mitchell*, 557 F.3d 257, 264, 270-71 (6th Cir. 2009), this Court held that a defendant in the "'borderline range

---

[5] Defendant's counsel objected to admission of the statement but on the basis that portions of it were unintelligible, thus calling into question the accuracy of the text which ran across the screen as an aid to listeners.

of intelligence'" who also suffered from a troubled upbringing and poor education knowingly, intelligently, and voluntarily waived his *Miranda* rights. Noting that "diminished mental capacity alone does not prevent a defendant from validly waiving his or her *Miranda* rights," we reasoned that this factor must instead "be viewed alongside other factors, including evidence of the defendant's conduct during, and leading up to, the interrogation." *Id.* at 264-65. In this case, the District Court found that:

> Defendant was alert and attentive and manifested no outward signs of being incoherent or otherwise incapable of giving a knowing, intelligent, and voluntary waiver of his rights. Using the term "Miranda" specifically, Defendant stated he knew his rights and wanted to make a statement.

(Order Denying Defendant's Motion to Suppress at 3.) Defendant's cooperativeness and coherency thus demonstrate that he grasped both the nature of the charges against him and the consequences that could flow from his interactions with police to effectuate a knowing, intelligent, and voluntary waiver of his *Miranda* rights. *See Garner*, 557 F.3d at 265. Moreover, retarded or not, he was capable of recounting facts he had experienced.

### 4. Imposition of Mandatory Life Sentence for Kidnapping Charge

Defendant's final argument relies heavily on *Atkins v. Virginia*, 536 U.S. 304, 321 (2002) to support the proposition that, because he is mentally retarded, his mandatory sentence of life imprisonment for kidnapping resulting in the death of the victim violates his Eighth Amendment protection against cruel and unusual punishment. We review this constitutional challenge *de novo*. In *Atkins*, the Supreme Court held that "death is not a suitable punishment for a mentally retarded criminal." 536 U.S. at 321. Indeed, Defendant was saved from the possibility of capital punishment

-12-

by the District Court's reliance on *Atkins*. Defendant now asks this Court to extend *Atkins* by holding that his sentence of life imprisonment, made mandatory by statute, 18 U.S.C. § 1201(a), similarly violates the Eighth Amendment because it fails to account for his inherently reduced culpability.

*Atkins*, however, has proven resistant to expansion beyond capital punishment. *See U.S. v. Tucker* , 204 Fed. Appx. 518, 521-22 (6th Cir. 2006); *U.S. v. Laffoon*, 145 Fed. Appx. 964, 964 (5th Cir. 2005). In *Tucker*, this Court explicitly held that "imposing a mandatory minimum sentence on a defendant with limited mental capabilities does not violate the Eighth Amendment ban on cruel and unusual punishment." 204 Fed. Appx. at 521. Because we do not agree with Defendant's assertion that the distinction between capital and non-capital sentences is "artificial" when assessing proportionality, we follow the holding in that case. *See id.* The Supreme Court and other courts have consistently recognized the crucial difference between capital and non-capital sentences. *See e.g., Harmelin v. Michigan*, 501 U.S. 957, 994 (1991) (reasoning that "proportionality review is one of several respects in which we have held that 'death is different,' and have imposed protections which the Constitution nowhere else provides"). As a matter of retributive justice, life imprisonment is not an unconstitutionally severe punishment for the crime of kidnapping and participating in the murder of Lott.

For the foregoing reasons, we affirm the judgment of the District Court.

**CLAY, Circuit Judge, dissenting.** I write separately because Shannon Shields, a mentally retarded defendant, suffered a serious injustice when the district court largely disregarded and minimized his mental status during the trial proceedings. As a result, Shields' right to a fair and constitutionally adequate trial was seriously compromised. I therefore respectfully dissent.

The kidnapping and murder of Jerrell Lott was a senseless and shocking crime. Soon after apprehending Shannon Shields and his cousin, Sonny Shields, the government announced its intention to seek the death penalty against the two accused men. Shannon Shields then requested a pretrial hearing to determine whether he was mentally retarded and thus ineligible to face the death penalty under *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).

The district court held an extensive eight-day evidentiary hearing on the matter. In the course of the hearing, the defense presented the expert testimony of two psychologists, as well as the lay testimony of Shields' parents, his sister, his longtime girlfriend, several of his former educators, and a prison counselor. The government presented the competing expert testimony of two additional psychologists. After considering the evidence and post-hearing memoranda, the district court issued a lengthy order finding Shields mentally retarded and thus ineligible to face the death penalty. (*See* RE 557, Order on Mental Retardation.)

The hearing produced ample evidence to conclude that Shields is mentally retarded. In five IQ tests administered over Shields' lifetime, his scores ranged from 69 at the lowest to 73 at the highest.[1] Shields cannot live independently, and he does not work. He relies extensively on the

---

[1]According to the Diagnostic and Statistical Manual of Mental Disorders (4th ed.–Text Revision) ("DSM-IV"), "significantly subaverage intellectual functioning" is defined as an IQ of 70

assistance of his parents and his girlfriend to complete common, everyday tasks. Shields cannot prepare his own food, follow a recipe, or shop for groceries. He cannot budget his own money, pay his monthly bills, or master a checkbook. Concepts that are, to the normal-functioning person, simple matters of common sense, are beyond Shields' grasp. To cite but a few salient examples, Shields does not understand the obligation to repay purchases made with a credit card. He does not see the need for and lacks the follow-through to obtain an identification card. He does not grasp the dangers of leaving a hot iron unattended.

Shields is completely unable to set his own priorities, to self-direct, or to complete even the most rudimentary tasks without the continual supervision and frequent reminders of a parent or other responsible adult. Although Shields has worked for brief periods in several unskilled positions, such as a dishwasher and a furniture mover, he has never been able to maintain steady employment due to his innate mental limitations. His inability to follow directions or to work productively without continual direction has also hindered his job prospects. As a result of these limitations, Shields has received some form of social security disability assistance since his teenage years.

Shields' mental limitations became manifest early in his childhood education. Without parental assistance, he struggled with grooming and personal hygiene, and he did not relate to his classmates in "age-appropriate" ways. After a year in kindergarten, Shields was unable to even recognize his own name in writing, let alone read or write it himself, despite his teacher's personal efforts to help him master this simple goal. In later years, Shields was disallowed from riding the

---

or below.

school bus because of his lack of independence and his frequent outbursts. In the classroom, Shields required constant individualized attention and instruction because he was unable to work independently or to stay on task without a teacher's direct supervision. Although Shields initially started on a mixed track of special education and regular classes, he struggled with the regular curricula and fell appreciably behind his peer group. By the ninth grade, school administrators completely removed Shields from the regular classroom and placed him on track to receive a "certificate of attendance" rather than a high school diploma. Shields' special education programming did not teach mainstream educational curricula, but instead focused on functional skills, such as learning how to count money and how to write basic information, like his address and his parents' names. Ultimately, Shields dropped out of school entirely by the tenth grade.

Despite the extent of Shields' mental deficiencies, his hindrances are not of the type that would be readily apparent to the average observer. As an adult, Shields is now "careful about his appearance" and "tries to keep himself well-groomed." He can speak well, and he possesses some limited reading skills, although his comprehension is sub-average, and he "lack[s] the ability to engage in deep and meaningful conversation." He is skilled at convincing others around him to accomplish tasks on his behalf, he ignores social strictures (for example, he drives although he has no license to do so), and he deceives others to achieve his personal objectives. Shields is often deceptive and manipulative; however, his stratagems are "transparent" and "not well thought out." Shields is gullible, susceptible to the influence of his peers, and he seemingly lacks ambition or long-term goals of his own. To quote the district court, Shields is an individual whose mental limitations

-16-

render him "largely disconnected from the types of social responsibilities and tasks expected of regularly functioning adults in society."

The district court deserves commendation for the attention it devoted to Shields' mental retardation hearing and its evaluations of Shields' eligibility for the death penalty. However, a defendant is not mentally retarded for purposes of the death penalty alone. As with any factual finding in a criminal proceeding, the district court's rulings on mental retardation should have proven salient throughout the remainder of Shields' trial proceedings. Unfortunately, after making detailed factual assessments about Shields' mental limitations, the district court then inexplicably shelved those facts and proceeded as though Shields' innate limitations did not exist for the remainder of his trial.

While defense counsel's willingness to also ignore Shields' mental retardation is incomprehensible, it is equally inexcusable for the district court to have set aside its own factual findings for the remainder of the trial. Although the district court was not obligated to try defense counsel's case, the court was not relieved of its duty to avoid glaring errors or to make independent inquiries to ensure that Shields received his right to a fair trial.

Specifically, the district court should have considered Shields' mental retardation when it ruled on the motion to suppress. Shields freely admits that he received a *Miranda* warning and that he waived his rights before he provided his recorded statement to police. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). However, for better or worse, *Miranda*'s now-familiar questions are an imperfect and approximate instrument for measuring the validity of a suspect's waiver. Ultimately, whether a suspect validly waived his rights depends not only on whether the *Miranda* warning was

properly given, but also on whether the waiver of the suspect's *Miranda* rights was made "voluntarily, knowingly, and intelligently." *Id*. at 444–45.

This fact-sensitive inquiry has two distinct dimensions. *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citing *Edwards v. Arizona*, 451 U.S. 477, 482 (1981); *Brewer v. Williams*, 430 U.S. 387, 404 (1977)). For a waiver to have been "voluntary," it must have been "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id*. For the waiver to have been made "knowingly and intelligently," it must have been made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* "Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights [were] waived." *Id*. (citing *Fare v. Michael C.*, 442 U.S. 707, 725 (1979) (internal quotation marks and additional citations omitted)).

Defense counsel only addressed the issue of voluntariness with respect to the *Miranda* waiver, summarily arguing that Shields' statement ought to be suppressed because "coercive police activity overbore his will." After considering the testimony of the interrogating officers, the district court disagreed with defense counsel's argument. It would appear that the district court correctly decided the issue of voluntariness, inasmuch as no evidence was elicited to suggest that the officers deliberately intimidated, coerced, or deceived Shields into giving an involuntary statement. *See Garner v. Mitchell*, 557 F.3d 257, 274 (2009) (en banc) (Moore, J., dissenting).

However, the district court never reached the second part of the waiver inquiry. The court never asked whether Shields—with all his innate mental deficiencies—possessed "the maturity,

intelligence, and competency to make a knowing and intelligent waiver." *Id*. at 274. Despite the fact that the district court's own earlier, detailed ruling strongly cast doubt on that issue, the court simply ignored Shields' mental retardation and failed to take it into account for the purposes of the suppression motion.

The government would have us fault defense counsel for this omission, arguing that Shields waived the opportunity to raise the "knowing and intelligent" argument because counsel failed to make that contention before the district court. If so, the government only highlights for our attention a glaring ineffective assistance of counsel claim.

Regardless of what defense counsel did or did not argue, however, the district court's inquiry should not have ended with respect to the officer's conduct. *Id*. at 275–76. The waiver inquiry encompasses two distinct parts, which work conjunctively, are therefore indivisible, and must *both* be considered to determine whether a valid waiver was made. *See id.* at 275. Deciding the validity of a waiver based solely on police conduct, without regard for whether the defendant had the capacity to make a knowing and intelligent waiver, reads the second element out of the waiver inquiry, and is clearly out of line with established Supreme Court *Miranda* jurisprudence. *Id*. In any event, it is utterly perplexing that Shields' mental retardation did not arise as a topic of concern during the suppression hearing, whether spontaneously or by the court's direction, given the obvious connection between Shields' mental limitations and his capacity to make a knowing and intelligent waiver of his *Miranda* rights.

As the majority correctly points out, finding a defendant mentally retarded does not preclude him from validly waiving his *Miranda* rights. *See Garner*, 557 F.3d at 264–65 (Rogers, J., majority).

However, the waiver inquiry is always fact-sensitive and dependent on the totality of the circumstances—even more so in a case like this one. *Id.* In this instance, the evidence indicates that Shields lacks basic life skills, is easily manipulated, and operates largely outside the realm of common sense reasoning. Under such circumstances, Shields' ability to mention *Miranda* by name is not necessarily indicative of his grasp of the charges against him or his understanding of the consequences of waiving his rights.[2] Unfortunately, this Court has no basis on which to evaluate Shields' capacity to make a valid waiver, because the district court failed to make the necessary and reasonable inquiries required to address the waiver issue.

The district court also should have taken Shields' mental limitations into account when Shields timely asked to wear street attire to his trial. Citing two prior cases from this Circuit, the majority reasons that the district court was not obligated to significantly delay proceedings to accommodate Shields' last-minute request. *See United States v. Brown*, 367 F.3d 549, 553–54 (6th Cir. 2004); *United States v. Williams*, 641 F.3d 758, 767 (6th Cir. 2011). However, *Brown* and *Williams* are clearly distinguishable from the case before us, because neither of those cases involved a mentally retarded defendant.

By contrast, in this case the district court was thoroughly aware that Shields' mental retardation may have rendered him slow to fully appreciate the nature and the seriousness of the proceedings, including the effects his prison clothes might have on the jury's impartiality. Rather

---

[2]Of course, these findings also bear directly on the central factual dispute raised by the defense—whether it was Defendant's cousin, Sonny Shields, who was primarily responsible for orchestrating the kidnapping and ultimately murdering Jerrell Lott.

than accommodate Shields' reasonable request, the district court instead offered the defense an even more limited option than was granted by the courts in *Brown* and *Williams*. The district court's proposed solution—that Shields wear a sport coat over his prison uniform—was really no solution at all. The court's limited offer was insufficient to protect Shields' right to an impartial jury, particularly given that his request, though admittedly belated, was technically timely. Furthermore, there was no substance to the district court's contention that permitting a short recess to allow Shields to change clothes would have significantly delayed the proceedings.

Finally, it is troubling that the escape charge was not severed from the rest of Shields' trial. At best, the evidence elicited on the escape count was minimal. Shields' attempted "escape" was childishly ill-planned and ill-thought out, which is perhaps unsurprising given his mental retardation. While awaiting trial on the kidnapping and murder charges, Shields was segregated in a high-security prison that allowed him one hour outdoors in an isolated pen housed within the prison's recreation yard. Shields and a fellow inmate pried loose the wire fence of their segregation pens, but they were quickly apprehended clinging to the inner perimeter fence of the recreation yard. Even if Shields' ineffective defense counsel unjustifiably waived its chance to request a severance of the escape charge, its facts were obviously weak and entirely tertiary to the other issues at trial. The district court should have been more vigilant in protecting Shields against the inclusion of this wholly unrelated, but highly prejudicial charge. At a minimum, some inquiry by the district court with respect to this issue would have been appropriate.

In any criminal trial, the presiding judge has an obligation to steward the proceedings in a manner that takes into account the full range of facts before the court and that steers clear of obvious

violations of the defendant's constitutional rights.  I cannot agree that Shields received this

consideration when the district court largely disregarded Shields' mental deficiencies, shunted aside

its own detailed factual findings with respect to Shields' mental retardation, and failed to take into

account the obvious inadequacies of the ineffective assistance defense counsel provided to the

defendant.  Accordingly, and for the reasons discussed above, I respectfully dissent.