**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 17a0365n.06

No. 15-5609

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jun 26, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| SHANNON SHIELDS, | ) | |
| | ) | ON APPEAL FROM THE |
| Petitioner – Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | OPINION |
| Respondent – Appellee. | ) | |

---

Before: BOGGS, BATCHELDER, and WHITE, Circuit Judges.

**BOGGS, Circuit Judge.** Following a jury trial, Petitioner Shannon Shields was convicted of (1) kidnapping resulting in the death of the victim, in violation of 18 U.S.C. § 1201(a); (2) carrying and using a firearm during and in relation to kidnapping, in violation of 18 U.S.C. § 924(c); and (3) attempted escape, in violation of 18 U.S.C. § 751(a). The district court determined that Shields was mentally retarded and thus ineligible for the death penalty under 18 U.S.C. § 3596. Shields was sentenced to consecutive terms of life, ten years, and five years in prison, respectively. Pursuant to 28 U.S.C. § 2255, Shields now asserts that even though trial counsel argued that Shields's confession "was not voluntary" and that "coercive police activity overbore [his] will," trial counsel provided constitutionally ineffective assistance by failing to argue in addition—before the very same trial judge—that Shields's mental retardation prevented his waiver of his *Miranda* rights from being "knowing and intelligent."

A waiver of *Miranda* rights must be made "voluntarily, knowingly, and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Mental retardation alone, however, does not

prevent a defendant from making a valid waiver of *Miranda* in order to confess to a crime. And even if Shields's trial counsel had argued that it did, Shields cannot show a reasonable likelihood that the district court would have granted Shields's motion to suppress. We therefore affirm the denial of Shields's motion for post-conviction relief.

# I

## *The Kidnapping*

According to eyewitness testimony at trial, at approximately 10:20 p.m. on May 19, 2004, Shields and his cousin Sonny approached a man named Jerrell Lott as he exited a grocery store in Memphis and got into his car. Either Shields or Sonny pointed a gun at Lott while the other demanded that Lott unlock his car and let them inside. Lott complied. The gunman kept the gun to Lott's head as they drove away. Surveillance video revealed that Sonny used Lott's ATM card to withdraw funds from an ATM approximately one hour after the initial carjacking.

Shields and Sonny then drove to the house of Sonny's friend Lendzo Parker. According to Parker's testimony, Shields and Sonny explained that they had robbed Lott and needed Parker's help to get rid of the car. Parker and Parker's friend James Stafford agreed to follow behind Shields and Sonny as they drove away in Lott's car with Lott trapped in the trunk. Two other witnesses testified to their departure.

Parker testified that the men crossed into Arkansas, stopped at a gas station, and bought a gas can, which Stafford filled at the pump with gasoline. The men then resumed driving, first on a secluded paved road and then on an unpaved road. They parked by a field. Shields and Sonny got out of Lott's car, opened Lott's trunk, and directed Lott to get out. Lott begged for his life. When Lott attempted to run away, Sonny pulled a gun and fired at him. Shields grabbed the gun and ran after Lott, firing additional shots as he ran. Sonny followed. Parker testified that he

heard several more shots before Shields and Sonny returned to the cars. The men then drove away in both cars, leaving Lott's body behind.

After arriving in Memphis, however, Sonny noticed that the cap to the gas can was missing, so the four decided to return to the field to find it. They were not successful, so they drove back to Memphis. They then looked for a place to burn Lott's car. Settling on a location near Hernando Street and Kerr Street, Shields parked the car in a field and lit it on fire, suffering burns to his arm and face in the process.

Lott's car was found by the police. Lott's body was later found in Crittenden County, Arkansas, by the farmer who owned the field in which the body had been left. According to a medical examiner, Lott had been shot five times including once in the head, was wearing only his underwear, and was badly burned after having been set on fire.

### *The Investigation*

Local television stations began airing surveillance-camera footage from the grocery store showing Shields and Sonny as they approached Lott's car. On May 21, Sonny turned himself in to the Memphis Police Department, making statements that implicated himself, but largely blaming Shields. *United States v. Shields*, 480 F. App'x 381, 385 (6th Cir. 2012).

Shields, meanwhile, went to his aunt's home, where he explained that he had been working on a car and been injured in a car-battery fire. Shields changed clothes and shoes and asked for a ride to Grenada, Mississippi, where he could meet up with his girlfriend. Shields told his girlfriend that he had been injured in a barbecuing accident. His girlfriend took Shields to a nearby hospital, where he checked in under the pseudonym "Willie Oliver." The hospital transferred him to a burn center in Greenville, Mississippi, where Shields continued to use the pseudonym.

3

Sonny told the police where to find Shields. Local law enforcement took Shields into custody in Greenville, and Memphis Police Detective Joseph Pearlman and Sergeant Jasper Clay drove down to Greenville on May 24. When Pearlman and Clay arrived, Shields began to tell them, unprompted, that he was not a killer and that he wanted to tell them his side of the story. Clay stopped Shields and proceeded to go with him to the U.S. Marshals' office at the federal courthouse in Greenville, where Shields was due to be arraigned.

After giving Shields an opportunity to eat, Pearlman and Clay entered his holding cell and presented Shields with a *Miranda*-waiver form that lists the *Miranda* rights.[1] Pearlman testified that his practice was first to turn the form over and ask the suspect about his education level, literacy, mental disabilities, and any recent pain-medicine or drug consumption, and then to ask the suspect to read the first line of the form out loud and the remainder of the form silently. Pearlman testified that he followed this practice with Shields, who read the first line of the form aloud.

Shields then said "I know my rights, I've been arrested before, I know I don't have to talk to you if I don't want to." Appellant's Br. 9. Pearlman testified that Shields then said, "I can stop talking any time I want to stop." Shields also printed his name on the *Miranda* waiver form and signed it. According to Pearlman, Shields specifically stated "I understand my *Miranda* rights," and he "was very cognizant and very aware and very eager to talk."

On the back of the *Miranda* waiver form, Pearlman had noted that Shields told him that he had been in special-education classes in high school, that he had dropped out in the 11th

---

[1] The waiver form articulated the rights as follows: (1) "You have the right to remain silent." (2) "Anything you say can be used against you in court." (3) "You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning." (4) "If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish." (5) "If you decide to answer questions now without your lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer."

grade, and that he "could read some but was not that good at it." Shields had also told the detectives that he had taken pain medication for the burns he had suffered five days earlier.

Shields then gave a 38-minute tape-recorded statement, which would be played for the jury at trial, implicating himself in Lott's kidnapping. Shields admitted, among other things, that he was at the scene of the carjacking, that he rode to the ATM, and that he was present when Sonny fired his gun at Lott and when Sonny set Lott's body on fire. Some of Shields's statement sought to shift blame to Sonny: Shields said, for example, that he did not know that Sonny had a gun until the two were approaching Lott's car, that Sonny threatened to kill Shields if he did not go along with the plan, that only Sonny fired the gun in the field, and that only Sonny was responsible for burning Lott's body.[2]

### *Shields's Trial*

Shields stood trial in the United States District Court for the Western District of Tennessee, with Judge Bernice Bouie Donald presiding. On August 19, 2008, Shields's trial counsel moved to suppress Shields's confession on the grounds that it was coerced and not voluntary. After this motion was made, and before Judge Donald ruled on it, Judge Donald held a pretrial hearing to determine whether Shields was mentally retarded so as to preclude the government from seeking the death penalty. The hearing spanned ten full days, including five days in November 2008 and five days in January 2009. Shields and the government each called both expert and lay witnesses to testify to Shields's mental capacity and ability to function.

Both parties submitted post-hearing memoranda. The parties stipulated to the definition of mental retardation in the *Diagnostic and Statistical Manual of Mental Disorders (Fourth Edition–Text Revision)* (DSM-IV-TR). According to the DSM-IV-TR, a finding of mental retardation has three requirements: (1) significantly subaverage intellectual functioning as

---

[2] Sonny and Shields each maintained that only the other of the two shot Lott.

demonstrated by an IQ of approximately 70 or lower on an individually administered IQ test; (2) concurrent deficits or impairments in present adaptive functioning in at least two of various areas such as communication, self-care, work, and so on; and (3) onset of the mental retardation before age eighteen.

On May 11, 2009, Judge Donald issued a 33-page order finding by a preponderance of the evidence that Shields was mentally retarded and thus ineligible for the death penalty. Among many other factors, Judge Donald considered Shields's Wechsler-battery IQ scores, which are summarized as follows:[3]

| IQ Test | Year | Full Scale Score | Verbal IQ | Performance IQ |
|---------|------|------------------|-----------|----------------|
| WISC-R | 1989 | 69 | 69 | 72 |
| WISC-R | 1992 | 73 | 68 | 82 |
| WISC-III | 1995 | 70 | 69 | 75 |
| WAIS-R | 1997 | 68 | 67 | 70 |
| WAIS-III | 2005 | 68 | 73 | 68 |

Judge Donald noted that when Shields was sixteen, "the Social Security Administration determined that [Shields's] IQ scores were at the high end of the mentally retarded range and found several deficits in adaptive functioning," qualifying Shields for Supplemental Security Income (SSI) payments. When Shields was twenty-one, the Social Security Administration concluded that Shields was mentally retarded but that he "did not qualify for [additional] disability benefits because . . . there were occupational roles [that he] was capable of fulfilling." Judge Donald also found that Shields had sporadic employment history including jobs as a

---

[3] Shields was born on May 6, 1981. The WISC is the Wechsler Intelligence Scale for Children; the WAIS is the Wechsler Adult Intelligence Scale. The "-R" suffix indicates a revised version; "-III" indicates a third edition. The Wechsler IQ tests gained widespread currency in the 1960s. Although some of the IQ scores are over 70, Judge Donald considered that the scores were sufficiently low to satisfy the DSM-IV-TR standard. As part of her reasoning, Judge Donald considered the Flynn Effect, a phenomenon by which observed IQ scores generated by a given IQ test are said to increase, on average, by approximately three points for every ten years that the IQ test has been on the market. While Judge Donald declined to use the Flynn Effect to impose a mechanical downward adjustment of any of the IQ scores, the Flynn Effect could account for much of Shields's four-point score increase between the 1989 and 1992 WISC-R test administrations.

restaurant dish washer and a furniture mover, although "as an adult he has had no apparent ambition or goals in life" and "has always depended on a woman benefactor."

Only *after* this extensive inquiry into Shields's mental capacity did Judge Donald return to a number of Shields's pretrial motions including his motion to suppress his confession. Judge Donald held an evidentiary hearing on the motion to suppress on August 13, 2009, and denied the motion four days later. Notably, although Shields's motion sought to suppress his confession on the grounds that it was not *voluntary*, without arguing that it was not knowing and intelligent, Judge Donald specifically found not only that Shields confessed of his own free will—i.e., voluntarily—but *also* that Shields had made a knowing an intelligent waiver under *Miranda*:

> After Defendant had eaten his lunch, the officers inquired of Defendant how he felt and whether he was in pain. Defendant responded that he was in some pain, but felt comfortable and well enough to talk to the officers. After the officers were satisfied that Defendant was both mentally and physically able to make a statement, Sgt. Clay apprised Defendant of his *Miranda* rights. Defendant was not in cuffs or other restraints, but he was in a cell along with Detective Pearlman and Sgt. Clay.
>
> Defendant was alert and attentive and manifested no outward signs of being incoherent or otherwise incapable of giving a knowing, intelligent, and voluntary waiver of his rights. Using the term "*Miranda*" specifically, Defendant stated that he knew his rights and wanted to make a statement. After being read his *Miranda* rights, Defendant signed a waiver of rights form. Detective Pearlman and Sgt. Clay witnessed Defendant's signature at approximately 1:00 p.m. Defendant thereafter proceeded to make a statement about his involvement in the alleged offenses. Officers tape recorded their questions and Defendant's answers. At a few points it was necessary to stop the tape briefly to inquire whether it was time for Defendant's court appearance, but these pauses did not result in the omission of any material parts of Defendant's interview.

In her order, Judge Donald "credit[ed] Detective Pearlman's testimony that [Shields] did not manifest signs of being incapable of a *knowing, intelligent, and informed* waiver of his rights" (emphasis added) when he agreed to speak to Pearlman and Clay. Even though Shields's defense counsel did not mention *Miranda* in his motion to suppress Shields's statement, Judge

Donald apparently conducted a full *Miranda*-waiver inquiry and concluded that nothing stood in the way of Shields's making an effective *Miranda* waiver and confession.

Jury trial commenced on October 19, 2009, and the jury returned a guilty verdict on October 23, 2009. Shields's trial counsel did not object to the playing of Shields's confession video at trial other than objecting to the use of portions of the video that were hard to understand, and to the accuracy of the captions superimposed on the video during those portions. *Shields*, 480 F. App'x at 388 n.5.

A panel of our court affirmed Shields's conviction, over Judge Clay's dissent, in 2012. *Id.* at 381. Shields filed a motion to vacate his sentence on September 30, 2013. The district court denied Shields's motion on April 8, 2015, and denied a certificate of appealability. In 2016, noting that Judge Clay had dissented on the issue of whether Shields's *Miranda* waiver was knowing and intelligent, we granted a certificate of appealability on the sole issue of whether trial counsel was ineffective in failing to argue that the *Miranda* waiver was not knowing and intelligent.

## II

We review de novo a district court's denial of a § 2255 motion to vacate a sentence for ineffective assistance of counsel. *See Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).

To be entitled to relief, Shields has the burden of proving by a preponderance of the evidence that he received constitutionally ineffective assistance of counsel. *Ibid.* Under *Strickland v. Washington*, a claim of ineffective assistance requires showing that "counsel's representation fell below an objective standard of reasonableness," 466 U.S. 668, 688 (1984), and that there is a "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. "A reasonable probability is a

probability sufficient to undermine confidence in the outcome." *Ibid.* "It is not enough . . . to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687; *see also Harrington v. Richter*, 562 U.S. 86, 112 (2011) ("The likelihood of a different result must be substantial, not just conceivable.").

### A. Trial Counsel's Performance Was Not Objectively Deficient

An attorney's performance is deficient under *Strickland* when, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." 466 U.S. at 690. An attorney is "strongly presumed to have rendered adequate assistance." *Ibid.* An attorney's action that "might be considered sound trial strategy" is not constitutionally deficient. *Id.* at 689.

Shields argues that his trial counsel was ineffective for failing to move to suppress Shields's confession on the grounds that Shields's mental retardation prevented Shields from making a knowing and intelligent *Miranda* waiver. True, *Miranda* has two dimensions: "voluntariness and comprehension." *Garner v. Mitchell*, 557 F.3d 257, 263 (6th Cir. 2009) (en banc). And trial counsel attacked only the voluntariness of Shields's *Miranda* waiver and not his comprehension of it.

But mental retardation itself does not prevent a defendant from comprehending—and choosing to waive—*Miranda* rights, and Shields points to no case law to tell us otherwise. *See Garner*, *id.* at 266 (where defendant with IQ of 76 "was not so mentally retarded that officers had reason to believe that he could not understand his rights," and where his "conduct, speech, and appearance at the time of interrogation indicated that his waiver was knowing and intelligent, notwithstanding his diminished mental capacity," defendant's confession to setting

9

house fire that killed five children was not obtained in violation of *Miranda*). Shields has the burden to carry and we have never held that a mentally retarded person like Shields (i.e., a person with an IQ of 70 or below, with adaptive deficits, whose mental retardation manifested itself by age eighteen) lacks the capacity to make a knowing and intelligent *Miranda* waiver based on mental retardation alone. *Cf. United States v. Macklin*, 900 F.2d 948, 952–53 (6th Cir. 1990) (noting that the right to make meaningful statements like confessions is based on the same free will that forms the basis "for the myriad valuable rights of citizenship" like the right to vote, to testify, to contract, or to conduct a defense, and that defendants who have "the ability to avail themselves of the incidents of citizenship" should not be excluded from the rights or the responsibilities of citizenship "absent a compelling showing" that they are capable of exercising neither). Shields's trial counsel therefore cannot be held to be deficient for failing to argue that Shields's mental retardation would intrinsically prevent him from making a valid *Miranda* waiver.

Importantly, on direct appeal, even though the panel did not have to consider the question of whether Shields's confession was not knowing and intelligent (because trial counsel did not raise it), the panel nevertheless did consider the issue. Judge Merritt wrote for the majority:

> [E]ven absent waiver, Defendant's claim fails on the merits. In *Garner v. Mitchell*, 557 F.3d 257, 264, 270–71 (6th Cir. 2009), this Court held that a defendant in the "'borderline range of intelligence'" who also suffered from a troubled upbringing and poor education knowingly, intelligently, and voluntarily waived his *Miranda* rights. Noting that "diminished mental capacity alone does not prevent a defendant from validly waiving his or her *Miranda* rights," we reasoned that this factor must instead "be viewed alongside other factors, including evidence of the defendant's conduct during, and leading up to, the interrogation." *Id.* at 264-65.
>
> [. . .]
>
> Defendant's cooperativeness and coherency thus demonstrate that he grasped both the nature of the charges against him and the consequences that

> could flow from his interactions with police to effectuate a knowing, intelligent, and voluntary waiver of his *Miranda* rights. *See id.* at 265.

*Shields*, 480 F. App'x at 388–89.

In his brief, Shields argues that if he has difficulty understanding things like "following multi-step recipes, paying bills, managing a checkbook, . . . the dangers of leaving a hot iron unattended, or how credit cards work" (although Shields apparently understood enough to *acquire* and *use* credit cards in his own name even if he has not claimed responsibility for *paying* his credit-card bills), then "it is difficult to see how Shields could understand and appreciate complex abstract concepts like the full measure of his rights under [the] Fifth Amendment— much less what it means to 'waive' those rights or the dangers of doing so." Appellant's Br. 32.

In support of this argument, Shields relies on *United States v. Betters*, 229 F. Supp. 2d 1103, 1107 (D. Or. 2002); *United States v. Robles-Ramirez*, 93 F. Supp. 2d 762, 766 (W.D. Tex. 2000); and *United States v. Aikens*, 13 F. Supp. 2d 28, 34 (D.D.C. 1998). These cases are not the law in our circuit but would not help Shields even if they were. In *Betters*, the defendant's *Miranda* waiver was held invalid where the mentally ill defendant was "highly intoxicated from alcohol, possibly under the influence of another drug, off her psychotropic medications, and likely in a manic state" when she purported to waive *Miranda*. In *Robles-Ramirez*, the defendant—who had an estimated IQ of either 66 or 72—spoke only Spanish, could neither read nor write, did not recognize the letters of the alphabet, functioned at a second-grade level in arithmetic, and functioned at a preschool level in literacy. The defendant there also suffered from a neurological impairment and generally suffered impairment in his ability to understand words. 93 F. Supp. 2d at 766. And in *Aikens*, the defendant was functionally illiterate, "did not know what the word 'required' meant," 13 F. Supp. 2d at 32, and could not understand *Miranda* rights even when explained orally. What all these cases reflect is the general principle that the

11

validity of a *Miranda* waiver is based on the totality of such circumstances as the defendant's background, education, and conduct during the interrogation. *See Garner*, 557 F.3d at 264–65. But none of these cases help Shields make his case that *he* did not knowingly and intelligently waive *Miranda*, or that his mental retardation somehow precluded him from doing so. Instead, the facts indicate that Shields knew his *Miranda* rights, understood how to waive or invoke them, and—more than simply acquiescing to a law enforcement officer's invitation to talk—asserted in considerable and correct detail his knowledge of the rights he wished to waive in order to make a confession. Thus, Shields has not carried his burden of proving that his trial counsel was constitutionally ineffective for failing to argue that Shields's mental retardation made his *Miranda* waiver unknowing or unintelligent.

## B. Shields Cannot Show Prejudice

Moreover, Shields cannot possibly show prejudice as *Strickland* requires. Judge Donald's eight-page order denying Shields's motion to suppress makes clear that Judge Donald *did* in fact consider not only the voluntariness of Shields's confession *but also* whether it was knowing and intelligent under *Miranda*. To prevail, Shields would have to show a reasonable likelihood that if his trial counsel had simply thought to argue to suppress Shields's statement as unknowing or unintelligent, Judge Donald would have suppressed it—*and* that the result of Shields's trial would have been different. But the likelihood that Judge Donald would have suppressed Shields's confession if only Shields's trial counsel had uttered one of the magic words "*Miranda*" or "knowing" or "intelligent" is essentially nil in light of the fact that Judge Donald—who knew *all the facts* concerning both Shields's mental faculties and his confession— *expressly ruled* that Shields's confession was voluntary *and* knowing *and* intelligent. Judge

Donald denied the motion to suppress only after holding *both* a ten-day evidentiary hearing on Shields's mental capacity *and* a separate evidentiary hearing on the motion to suppress.

## CONCLUSION

In sum, the district court properly denied Shields's motion to vacate his sentence. We therefore **AFFIRM**.

**HELENE N. WHITE, Circuit Judge, concurring in the result.**

I concur in the result because Shields's confession added little to the eyewitness testimony, and that testimony, together with Shields's burns, would have resulted in his conviction with or without his confession.

I would not conflate the issue whether Shields's confession was voluntary—the issue decided at the suppression hearing—with the issue whether he was capable of waiving his *Miranda* rights.

## I

First, trial counsel was deficient in failing to argue Shields's waiver was not knowing and intelligent. "A reviewing court must judge the reasonableness of counsel's actions on the facts of the defendant's case, viewed from counsel's perspective at the time." *Higgins v. Renico*, 470 F.3d 624, 631–32 (6th Cir. 2006).

Following a ten-day *Atkins* hearing, the district court issued a thirty-three page order explaining in detail Shields's mental limitations and concluding he is mentally retarded. Soon after the *Atkins* hearing, the district court held a hearing on trial counsel's motion to suppress. Given the obvious connection between Shields's mental limitations and his capacity to knowingly and intelligently waive *Miranda* rights, trial counsel's failure to advance that argument is incomprehensible. Trial counsel filed his motion to suppress on August 19, 2008, after the government produced Shields's recorded statement. Trial counsel did not supplement the motion to suppress to argue that Shields's waiver of *Miranda* rights was not knowing and intelligent, even though the district court determined that Shields's functioning is that of a child in the range of eight to eleven years old, PID 5988, and he exhibits "deficits or impairments in present adaptive functioning" in multiple areas including functional academic skills, home

14

living, work, use of community resources, and self-direction. PID 5978, 5988, 5990–94. The court also observed that Shields lacks the ability to engage in "meaningful conversation," and that although he may provide answers to questions that sound plausible, further probing will show that "the answer originally given is . . . unreliable." PID 5974. These findings provided strong support for the argument that Shields's waiver of his *Miranda* rights was not knowing and intelligent.[4]

Second, there was a reasonable probability that the district court would have granted a motion to suppress brought on the omitted grounds. The majority concludes that the district court's purported finding that Shields's *Miranda* waiver was knowing and intelligent evidences that there is no reasonable probability that the district court would have granted a motion to suppress brought on those grounds. Maj. Op. at 12 ("the likelihood that Judge Donald would have suppressed Shields's confession if only Shields's trial counsel had uttered one of the magic words "*Miranda*" or "knowing" or "intelligent" is essentially nil in light of the fact that Judge Donald . . . *expressly ruled* that Shields's confession was voluntary *and* knowing *and* intelligent." (emphasis in original)). However, trial counsel's motion to suppress Shields's statement was brought solely on voluntariness grounds. The district court did not undertake the fact-specific inquiry required to determine whether Shields knowingly and intelligently waived his *Miranda* rights *because the issue was not before it*. Further, no part of the earlier *Atkins* hearing addressed Shields's ability to understand *Miranda* warnings. *Cf.* Maj. Op. at 7, 12. In ruling on the motion to suppress, the district court simply observed that Shields was "alert and attentive" and "did not manifest signs of being incapable of a knowing, intelligent, and informed waiver." PID 6070. These statements do not indicate or suggest that the court considered

---

[4] Judge Clay concluded the same in his dissent in *Shields v. United States*, 480 F. App'x 381 (2012).

whether Shields's mental retardation contributed to an invalid waiver of *Miranda* rights. The inquiry would have differed had trial counsel argued Shields's waiver of his rights was not knowing and intelligent: whether the officers had reason to believe Shields comprehended the warnings and whether he had the actual mental ability to understand the warnings at the time of the interrogation. *Garner v. Mitchell*, 557 F.3d 257, 263 (6th Cir. 2009) ("while our primary focus must remain on what the interrogating officers could have concluded about Garner's ability to understand the warnings, we may consider later-developed evidence of a defendant's actual mental ability to understand the warnings at the time of the interrogation. This is because, if it turns out by subsequent inquiry that a defendant in his mind could not actually understand the warnings, the finder of fact may be more inclined to determine in a close case that the police should have known that the defendant could not understand.")

Here, although Shields told Pearlman and Clay, the interrogating officers, that he had been in special education classes, dropped out of high school, could read some but was not good at it, and that he had taken pain medication that morning for the burns that Pearlman acknowledged were all over Shields's face and arms, the officers explained none of the *Miranda* rights to Shields. PID 7400-01. Rather, Pearlman had Shields read the first line of the *Miranda* rights form out loud, i.e., "You have the right to remain silent." Pearlman testified that Shields said he knew his rights, had been arrested before, and knew that he did not have to talk to the officers if he did not want to. The officers did not follow up to determine whether Shields understood his remaining rights, particularly the rights to talk to a lawyer before being questioned and to have a lawyer present during questioning. Nor did the officers follow up to determine whether Shields understood the warning that anything he said could be used against him in court. Had the issue whether Shields's waiver of *Miranda* rights was knowing and

16

intelligent been before the district court, there is a reasonable probability that the  district court would have concluded that there were strong grounds for finding an invalid waiver–definitely stronger than in *Garner*, 557 F.3d 257, on which the majority relies.  Maj. Op. at 9–10.  In *Garner*, in stark contrast to the instant case, the interrogating officers "carefully read" Garner his *Miranda* rights and Garner "stated clearly . . . that he understood those rights."[1]  *Id.* at 265.

## II

Nevertheless, I concur in the result because I conclude the admission of Shields's confession did not affect the outcome of the trial.  As described in the majority opinion, Parker gave a detailed first-hand account of Sunny's and Shields's actions. The only part he did not observe was who shot Lott in the woods.  But Shields's confession does not provide incriminating evidence on that point, as Shields did not admit to being the shooter.  Parker's testimony and Shields's burns, taken together, make it highly improbable that suppression of the statement would have affected the outcome of the trial.  On that basis, I concur.

---

[1] Garner was nineteen, had a troubled upbringing, poor education, and an IQ of 76 that placed him in the borderline range of intelligence.  *Garner*, 557 F.3d at 263.  Unlike Shields, Garner completed 12th grade and told the police that he could read.  *Id*. at 276 (Moore, J., dissenting).  Most importantly, unlike Shields's interrogation, the officers in *Garner* confirmed that Garner understood each of the rights and the consequences of waiving them by verifying each provision individually, "*Garner was carefully read his Miranda rights* and *stated clearly* to officers *that he understood those rights*."  *Garner*, 557 F.3d at 265 (emphasis added).